OPINION OF THE COURT
BECKER, Circuit Judge.
Appellee Rosetta Porter, a debtor in bankruptcy, brought this adversary action in the Bankruptcy Court for the Eastern District of Pennsylvania against appellant Mid-Penn Consumer Discount Co. (“Consumer”) under the Truth in Lending Act (“TILA”), 15 U.S.C.A. §§ 1635 and 1640 (West 1982 and 1991 Supp). Porter claims that that Consumer failed to honor her request to rescind a 1987 loan that was secured by a mortgage on her home. TILA and its implementing regulations normally allow borrowers three days to rescind, but they require lenders to provide a clear and conspicuous disclosure of rescission rights, and they extend the borrower’s right to rescind to three years if the lender’s disclosure is insufficient. 15 U.S.C.A. §§ 1635(a), (f); 12 C.F.R. § 226.-23(a)(3) (1991). Porter claims that Consumer failed to disclose clearly the effects of rescission, and that her 1990 request for rescission was therefore timely and should have been honored under 15 U.S.C.A. § 1635(b). In addition to rescission, she seeks actual and statutory damages and attorney’s fees under 15 U.S.C.A. § 1640 for Consumer’s failure to effect the rescission.
The only issue before us is whether Consumer’s notice clearly apprised Porter of her rescission rights. As a threshold matter, Porter takes the position that the 1987 transaction was a “refinancing” that was partially exempt from rescission by virtue of 15 U.S.C.A. § 1635(e)(2) and 12 C.F.R. § 226.23(f)(2). That is, she claims that her statutory right of rescission extended only to moneys newly advanced, and not to debt carried over from an earlier 1986 loan from Consumer. At the time of the loan, however, Consumer gave Porter the standard H-8 form notice designed by the Board of Governors of the Federal Reserve System (“the Board”) for “general” usage (typically for new loans), rather than the H-9 form notice specifically designed for “refinanc-ings” or some other notice specially designed for her transaction. The H-8 informs the borrower that he or she may rescind “this transaction,” while the H-9 states that the borrower may rescind only moneys newly advanced in the “refinancing.” Porter contends that the H-8 could be read to say that she had the right to rescind her entire loan (both new- and old-money portions), and therefore Consumer’s notice was defective because it did not clearly apprise her that she had the statutory right to rescind the new-money portion alone.
The bankruptcy court agreed with Consumer, however, that the transaction was not a “refinancing,” that Porter therefore *1068 did have the statutory right to rescind both old and new moneys, and that Consumer therefore did not violate TILA by giving her the H-8 notice. 122 B.R. 933. On appeal, the district court reversed and remanded for determination of proper remedies, 129 B.R. 397, holding that the transaction was a partially exempt “refinancing” and therefore the H-8 was an inadequate notice because it inaccurately suggested that Porter had the right to rescind the whole loan. For the reasons that follow, we will affirm.
I. FACTS AND PROCEDURAL HISTORY
Three loan transactions are relevant to this case. Porter first obtained a loan from Consumer in 1986, and, as part of that transaction, Consumer took a mortgage on Porter’s home, or “principal dwelling” in TILA terminology. On May 18,1987, Porter entered into another loan transaction with Consumer. At that time, Porter still had slightly over $1000 remaining outstanding on her 1986 loan, and by the terms of the 1987 agreement, Consumer was to pay off Porter’s account and lend her additional money (approximately $2100 to pay off a loan from another consumer loan company named Fleet and and approximately $500 for Porter herself).[1]
Consumer was to satisfy the 1986 mortgage and to take a new mortgage. Consumer immediately sent the new (1987) mortgage to Philadelphia City Hall for recording, which occurred on May 22, 1987, just one day after the expiration of the three-day “cooling off” period during which TILA requires that lenders allow consumers to change their minds and rescind their loans, 15 U.S.C.A. § 1635(a).[2] Consumer did not satisfy the 1986 mortgage immediately, however. It waited until May 27, 1987, several days after the expiration of the three-day rescission period, to execute a satisfaction piece for the 1986 mortgage. Thus Consumer held two mortgages on Porter’s home for a brief time.
When the 1987 loan was signed, and in an attempt to comply with 15 U.S.C.A. § 1635(a), Consumer furnished Porter a notice of her right to rescind that was substantively identical to the Board’s “Rescission Model Form (General).” That form is commonly known as the H-8 form because it is the eighth entry in Appendix H to the Board’s Truth-in-Lending regulations (“Regulation Z”), 12 C.F.R. part 226, reprinted in full at 15 U.S.C.A. following § 1700 (West 1982 & Supp.1991). Consumer’s notice did not advise Porter that two mortgages would be temporarily held simultaneously, nor did it in any other way mention the 1986 loan or the effect of the 1986 loan on Porter’s rescission rights.
The front side of the notice that Porter received in 1987 read (with handwritten portions in curly braces):
NOTICE OF RIGHT TO CANCEL
CUSTOMER DATE OF CONTRACT NAME(S): OR LOAN
{Rosetta Porter} {5/18/87}
CONTRACT OR LOAN NUMBER {104150}
*1069 Your Right to Cancel:
You are entering into a transaction that will result in a (mortgage/lien/security interest) (on/in) your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:
(1) the date of the transaction, which is {5/18/87}; or
(2) the date you received your Truth in Lending disclosures; or
(3) the date your received this notice of your right to cancel.
How to Cancel:
If you decide to cancel this transaction, you may do so by notifying us in writing at
MID-PENN CONSUMER DISCOUNT CO.
21 S. 12th ST., PHILADELPHIA, PA 19107
PHONE: 563-1300
You may use any written statement that is signed and dated by you and states your intention to cancel, and or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.
If you cancel by mail or telegram, you must send the notice no later than midnight of {5/21/87} (or midnight of the third busines's day following the latest of the three events listed above). If you send or deliver your written notice to cancel in some other way, it must be delivered to the above address no later than that time.
I WISH TO CANCEL
Consumer’s Signature
Date
The undersigned customer(s) acknowledge receipt of two copies of this notice on this date {5/18/87}
{Rosetta Porter}
(Customer’s Signature)
See reverse side for important information about your right to cancel.
The reverse side of the form read:
EFFECT OF CANCELLATION
If you cancel the transaction, the (mortgage/lien/seeurity interest) is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the (mortgage/lien/seeurity interest) (on/in) your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.
You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the creditor. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.
Porter acknowledged receiving these notices, but she did not elect to rescind her loan within the three-day statutory period.
Porter made payments on the 1987 loan, but on April 8, 1988 she took out a loan with Mid-Penn National Co. (“National”), a company affiliated with Consumer.[3] The 1988 transaction was structured similarly to the 1987 transaction. National agreed to pay off the mortgage loan to Consumer and also advanced Porter approximately *1070 $2600 in new money (again roughly $2100 to repay a loan to Fleet and $500 for Porter herself). Once again, a new security interest was taken and the old (1987) mortgage satisfied, and for a short period the Mid-Penn companies (again) held two mortgages. National’s mortgage associated with the 1988 loan was recorded on April 13, 1988, and on April 14, 1988 Consumer executed a satisfaction piece for the 1987 loan, although that satisfaction piece was not recorded until April 26, 1988. As part of the 1988 loan transaction, National provided Porter with a notice essentially identical to the H-8 with which Consumer had provided her in 1987.[4] Again, Porter did not rescind within the allotted three-day period.
Porter apparently made over $4000 in payments on the 1988 loan, but on March 28, 1990, she filed a petition for relief under Chapter 13 of the Bankruptcy Code. On or about May 10, 1990, Porter sent Consumer and National notices by which she demanded, pursuant to 15 U.S.C.A. § 1635(b), that Consumer rescind the 1987 transaction and that National rescind the 1988 transaction.[5] Neither of the Mid-Penn companies rescinded within twenty days of Porter’s demand. Instead, on May 2, 1990, Consumer filed a proof of claim in the bankruptcy court for Porter’s prepetition arrearages of $600 to National and for over $5000 for postpetition amounts falling due.
On July 31, 1990, Porter commenced an adversary proceeding in the bankruptcy court. Her complaint contained five counts. Count One was against Consumer for its failure to rescind the 1987 loan. Based on TILA, 15 U.S.C.A. §§ 1635 and 1640, Porter sought declaratory and injunc-tive relief (rescission), as well as actual and statutory damages and attorney’s fees. Count Two was a similar action against Consumer based on the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa.Stat.Ann. §§ 201-1 to 201-9.2 (Purdon 1971 & 1991 Supp.), using the TILA violation as a predicate. Counts Three and Four were near duplicates of Counts One and Two, except that they named National and complained about its failure to rescind the 1988 loan. Count Five consisted of miscellaneous objections to Consumer’s bankruptcy proof of claim.
Porter had two theories of TILA violation, both based on alleged inadequacies of notice. First, she claimed that the Mid-Penn companies violated TILA by failing to tell her that they would temporarily retain multiple mortgages. The defendants’ response was, essentially, that the period that they simultaneously held two mortgages was de minimis, and that they had satisfied the old mortgages reasonably promptly. Second, Porter contended that the Mid-Penn companies improperly gave her the standard H-8 rescission notice, which was confusing in this context. Instead, she claimed, the Mid-Penn companies should have provided a notice reflecting that the 1987 and 1988 transactions were partially exempt “refinancings” un *1071 der 15 U.S.C.A. § 1635(e)(2) and 12 C.F.R. § 226.23(f), and clearly informing her that her right to rescind extended only to the new-money portions of the loans. The defendants responded that the 1987 and 1988 transactions were new loans with new mortgages, rather than “refinancings,” and therefore Porter had the right to rescind the whole loans (new and old portions), as the H-8 notice properly advised her.[6]
A trial was held on November 29, 1990, and on January 7, 1991, the bankruptcy court ruled in favor of the defendants, except as to one minor matter. See In re Porter (Porter v. Mid-Penn Consumer Discount Co.), 122 B.R. 933 (Bankr.E.D.Pa.1991). In its view, the defendants acted reasonably and promptly in satisfying the old mortgages. The court expressed doubt about the vitality of earlier rulings that retaining multiple mortgages without notice violated TILA, but held that in any event satisfaction within 45 days was satisfactory.[7] Relying on its earlier decision in In re Matzulis (Matzulis v. Mid-Penn Consumer Discount Co.), Bankr. No. 86-01964S, Adv No 86-0691S (Bankr.E.D.Pa. Jan 22, 1987), it held that the instant transactions were not “refinancings” because all prior mortgages were to be satisfied and a brand new security interest was to be taken. It therefore held that the H-8 (general use) form was proper. Because the state law claims were dependent on the TILA violation, the court ruled against Porter on them as well, and entered judgment in favor of the defendants on Counts One through Four.[8]
Porter appealed to the district court, presenting only her TILA claims with respect to both the 1987 and 1988 transactions.[9] In an unpublished opinion, the district court reversed. It concluded, contrary to the bankruptcy court, that the 1987 and 1988 transactions were both “refinancings” and held that they were partially exempt from rescission, although only if the original loan and the refinancing were by the same lender. The court held that the 1987 transaction was partially exempt from rescission (the 1986 and 1987 loans were both from Consumer), and that the general-use H-8 was an improper notice for that transaction because it implied the right to rescind both old- and new-money portions of the loan. As to the 1988 transaction, the court held that the same result would obtain, but only if National (which made the 1988 loan) was, for TILA purposes, the same lender as Consumer (which made the 1987 loan). The district court remanded for the bankruptcy court to make that factual finding and to determine the remedies to which Porter was entitled. Consumer now appeals, challenging the district court’s conclusions on the adequacy of the notice of rescission rights in connection with the 1987 transaction.[10]
*1072 II. APPELLATE JURISDICTION
The bankruptcy court’s rejection of all of Porter’s claims was unquestionably “final,” and therefore the district court had appellate jurisdiction under 28 U.S.C. § 158(a) (1988). More questionable, however is our jurisdiction under 28 U.S.C. § 158(d), which gives the courts of appeals jurisdiction over “final decisions, judgments, orders, and decrees” entered under 28 U.S.C. § 158(a). Certainly, the district court’s disposition was not “final” in the sense that we use the term under 28 U.S.C. § 1291 (1988), because litigation on the merits is not over. The 1988 loan was part of the same complaint, and the bankruptcy court has still to decide on remand whether Consumer and National are the same lender. Moreover, the district court remanded the case to the bankruptcy court for determination of remedies, and those issues have not been resolved.[11]
But this court, unlike most other courts of appeals, has taken a more “pragmatic” approach to hearing bankruptcy appeals since the leading case of In re Marin Motor Oil, Inc. (Official Unsecured Creditors’ Committee v. Michaels), 689 F.2d 445 (3d Cir.1982). See generally In re Continental Airlines, 932 F.2d 282, 285-86 (3d Cir.1991) (summarizing our case law but noting that the majority of courts of appeals reject our approach). In Marin Motor Oil, we noted that “[mjany of the principal rationales for narrowly construing finality are based on an understanding of the proper relation between a trial court and an appellate court, and have less applicability when one appellate court is asked to review what is in effect a lower appellate court.” 689 F.2d at 449. We also noted that bankruptcy cases have traditionally been subject to more lenient finality rules than other cases, under the case law of this circuit interpreting the earlier Bankruptcy Act. Id. at 448-49. We therefore held that “when the bankruptcy court issues what is indisputably a final order, and the district court issues an order affirming or reversing, the district court’s order is also a final order_” Id. at 449.
The jurisdictional statute has changed since Marin Motor Oil, but the finality language in today’s statute remains essentially similar, and we have consistently applied Marin Motor Oil’s holding with one class of exceptions. In In re Brown (Brown v. Pennsylvania State Employees Credit Union), 803 F.2d 120 (3d Cir.1986), we held that the ordinary, stringent rules of finality apply to bankruptcy appeals that affect neither the distribution of the debt- or’s assets nor the relationship among creditors. Id. at 123. We stressed there, however, that the basic Marin Motor Oil premise that we should consider finality functionally in bankruptcy cases was still valid. Id. at 122.
In this case, as in Marin Motor Oil, we face conflicting considerations of judicial economy. Courts of appeals are generally restricted to hearing only “final” decisions for at least three reasons. First, deciding an interlocutory appeal may prove unnecessary because the issue may become moot in light of further proceedings in the trial court. Second, it is normally more efficient to hear all appeals in a single case together. Third, interlocutory appeals may delay trials.
As to the first consideration, in light of the district court’s rulings, this court will at some point have to face the issue now appealed (Consumer’s liability for providing an unclear notice of the effects of rescission). That issue will not disappear on remand to the bankruptcy court. On the other hand, we may face the prospect of piecemeal appeals if we affirm the order of the district court (although not if we agree instead with the bankruptcy court), because issues regarding the identity of the lenders and regarding remedies on both claims may also be appealed later. The *1073 issues on remand do not appear complex, however. Thus, any future duplication of judicial resources will be slight. Moreover, we have no concern about delaying the proceedings here, when trial has already taken place, the bankruptcy court has issued an undisputably final judgment, and the parties and the bankruptcy court apparently agree that our hearing this appeal now would be the most efficient course.
We conclude that we must apply our holding in Marin Motor Oil that district courts’ appellate dispositions of indisputably final bankruptcy court decisions are immediately appealable. The Brown exception does not apply because this appeal, if decided, will affect the distribution of Porter’s assets in bankruptcy: if we affirm, for example, Mid-Penn’s claim against Porter's estate will be reduced or eliminated. Nor do pragmatic considerations militate against hearing the appeal now. We therefore proceed to the merits, exercising plenary review over the district court’s conclusions of law, which are the only subjects of appeal.
III. ADEQUACY OF THE NOTICE OF RESCISSION RIGHTS
A. The Statutory Scheme and the Parties’ Contentions
The parties agree on the basic statutory and regulatory structure governing this appeal. TILA generally permits a consumer borrower to rescind a loan transaction that results in the creditor taking a security interest in the borrower’s principal dwelling. 15 U.S.C.A. § 1635(a) (quoted in note 2). The creditor must “clearly and conspicuously disclose” the borrower’s rescission rights and provide forms for the borrower to do so, in accordance with regulations promulgated by the Board. Id. The Board’s regulations require lenders to deliver to borrowers two copies of a notice of the right to rescind, and the notice must clearly and conspicuously disclose:
(1) The retention or acquisition of a security interest in the consumer’s principal dwelling.
(2) The consumer’s right to rescind the transaction.
(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor’s principal place of business.
(4) The effects of rescission, as described in paragraph (d) of this section.
(5) The date the rescission period expires.
12 C.F.R. § 226.23(b). The effects of rescission that must be disclosed under 12 C.F.R. § 226.23(d) are essentially those stated in 15 U.S.C.A. § 1635(b) (quoted in note 5). Under the statute and regulations, if the lender’s notice is proper, the borrower’s right to rescind lasts for three days, but the rescission period extends to three years if the required notice and material disclosures (the annual percentage rate, finance charge, amount financed, total of payments, and payment schedule) are not delivered. 12 C.F.R. § 226.23(a)(3) (based on 15 U.S.C. § 1635(f)).
Porter’s request to rescind came after three days following the transaction but before three years had expired. It was therefore timely only if Consumer’s notice was deficient. Porter agrees that she received the material disclosures and two copies of the cancellation notice. She also concedes that the notice properly told her when and how to rescind. Her claim is only that Consumer did not clearly notify her how her rescission rights were limited, and therefore did not clearly indicate what the effects would be if she rescinded.
The limitation on her rescission rights, she argues, comes from 15 U.S.C.A. § 1635(e)(2), which provides that the provisions of section 1635 do not apply to
a transaction which constitutes a refinancing or consolidation (with no new advances) of the principal balance then due and any accrued and unpaid finance charges of an existing extension of credit by the same creditor secured by an interest in the same property.
The Board has interpreted the “refinancing” exemption as follows:
(f) Exempt transaction. The right to rescind does not apply to the following:
[[Image here]]
*1074 (2) A refinancing or consolidation by the same creditor of an extension of credit already secured by the consumer’s principal dwelling. The right of rescission shall apply, however, to the extent the new amount financed exceeds the unpaid principal balance, any earned unpaid finance charge on the existing debt, and amount attributed solely to the costs of the refinancing or consolidation.
12 C.F.R. § 226.23(f).[12] In short, a borrower may rescind the “new money” portion of certain “refinancings,” but not the “old money” portion.
The exemption has a rather simple rationale. Although in general consumer borrowers need a “cooling off" period to reconsider encumbering the title to their homes, a borrower who refinances has already had that time to rethink with respect to the old money. The borrower may want to reconsider further indebtedness, as that constitutes an additional risk of losing his or her home,[13] but Congress evidently felt that it would be unfair to lenders if, simply by the expedient of seeking refinancing for the same amount, borrowers could gain the right to cancel the earlier loan.[14] In short, although the general requirement of notification and opportunity to rescind protects borrowers, the statutory exemption for “re-financings” avoids overprotecting them at the expense of lenders.
When a “refinancing” does not involve new money, no disclosure of the (nonexistent) right to rescind is necessary, but where a “refinancing” does involve new money, lenders must still clearly notify borrowers of their (limited) rescission rights. Because rescission rights in “refinancing” situations differ from those applicable in new-loan situations, the Board promulgated, in addition to the H-8, a model rescission form H-9 for partially exempt “re-financings.” See Appendix H-9 to 12 C.F.R. part 226. The H-9 crucially differs from the H-8 in that it spells out that the borrower has the right to cancel the new transaction to the extent of the increase in the amount of credit, but that such cancellation will not affect the amount that the borrower already owes or the lender’s existing security interest.[15]
Consumer does not dispute this analysis. Instead, it argues that the 1987 transaction was not a “refinancing” at all for purposes of TILA. Therefore, in its view, Porter was entitled to rescind the entire 1987 loan (the old money first lent in 1986, as well as the new money first provided in 1987). By providing the H-8 notice, says Consumer, it adequately apprised Porter of her right to rescind both the old-money and new-money portions of the loan. Porter responds that the transaction was a partially exempt “refinancing,” and therefore she was only entitled to rescind the new-money portion of the 1987 loan. In her view, the H-8 form, which applies to “general” loan transactions (as opposed to the H-9, which is specifically intended for “refinancings”), was *1075 necessarily an inadequate notice. Consumer rejoins that even if the transaction was a “refinancing,” it could not have given the H-9 because the H-9 would have been misleading, and thus it cannot be faulted for providing the H-8. Moreover, it says, at worst it gave Porter “too many” rescission rights by letting her rescind both the old and new money portions, and that giving Porter more than TILA requires cannot violate the statute.
Our inquiry must proceed in two steps: we must determine (1) what rescission rights Porter had (which in turn depends on whether the transaction was a partially exempt “refinancing”); and (2) whether the H-8 gave Porter clear notice of those rights. We first conclude that the transaction was a partially exempt “refinancing” such that Porter was statutorily entitled to rescind only the new-money portion of the 1987 loan. We then conclude that the H-8 did not give Porter clear notice of that partial rescission right, as TILA requires.
B. Was the Transaction a Partially Exempt “Refinancing”?
The right to rescind does not apply to a “refinancing or consolidation by the same creditor of an extension of credit already secured by the consumer’s principal dwelling.” 12 C.F.R. § 226.23(f)(2). Consumer contends, as the bankruptcy court concluded, that “refinancings” only include transactions that are “already secured” by a prior mortgage, as opposed to transactions secured by new mortgages. According to Consumer, where, as here, the lender satisfies the old mortgage and takes a brand new mortgage, the transaction is essentially a brand new loan and not a “refinancing.” Consumer points to the H-9 for support, noting that the H-9 covers “refinancings” and by its terms assumes the retention of an existing security interest.
We agree with the district court, however, that under a far more grammatical reading of the statute and regulation, “already secured” modifies the immediately preceding phrase, “extension of credit,” and thus the extent of rescission rights turns on whether the earlier loan was already secured by an interest in a principal dwelling, rather than on whether the current transaction is already secured. The district court’s interpretation better comports with the ordinary usage of the term “refinancing” as meaning the restructuring of terms of an existing loan; we do not in ordinary conversation define “refinancing” by whether a new security interest is taken. On that view, the regulation does not even define “refinancing,” but merely takes the ordinary meaning as a given and defines which “refinancings” are exempt, namely those where the earlier loan was secured by a security interest in a principal dwelling.[16]
Consumer’s interpretation is also flawed because it would have the exemption from rescission turn' on a technicality, rather than on the purpose of the exemption. As we noted, the exemption serves to protect a refinancing lender from rescission of the whole loan. In a refinancing, the borrower has already had a chance to rethink the desirability of risking his or her home by borrowing the old money, and now only needs the opportunity to reconsider adding to the risk of losing his or her home by taking on more debt. Our interpretation of the statute and regulation is consistent with that purpose: the right to rescind is limited when the earlier loan was already secured by a security interest in the home. In contrast, under Consumer’s interpretation, the exemption turns on the formality of whether a new security interest is drawn *1076 up, which has nothing to do with whether the lender’s interests will be compromised or what the borrower may need to rethink.
In sum, the district court was plainly correct to hold that the 1987 transaction was a “refinancing” not subject to complete rescission. Porter had the statutory right to rescind the new money portion of her loan, but not the old money portion.
C. Was the H-8 Notice Adequate in This Context?
Under both TILA itself and Regulation Z, the test is whether the H-8 that Consumer provided constituted a clear notice of Porter’s right to rescind the new-money portion of the loan. See 15 U.S.C.A. § 1635(a); 12 C.F.R. § 226.23(b). Rather than parsing the H-8 itself, however, both sides make arguments that focus on the relationship between the H-8 and the H-9.
Consumer repeatedly reminds us that the H-9 form would have been misleading given the way the 1987 transaction was structured. The wording of the H-9 notice presumes that the earlier mortgage would be retained and the new mortgage would supplement the old one, thus if the new transaction were rescinded, the retained old mortgage would remain in place unaffected. See note 15 (quoting the H-9). That was not the case here: under Consumer’s practice, a brand new loan document covering the whole amount (old and new funds) was drawn up and the 1986 mortgage was to be satisfied. Consumer thus suggests that its rejection of the H-9 in favor of the only other model rescission notice, the H-8, was acceptable. For her part, Porter suggests that the Board’s promulgation of the H-9 shows that the Board considered “refi-nancings” to be more complicated than new loan transactions. Therefore, she submits, Consumer’s use of the H-8 in a “refinancing” situation violated TILA per se.
We believe that the parties’ focus on the model forms has led them astray from the real issue. Congress directed the Board to issue model forms for common transactions, 15 U.S.C. § 1604(b), and the Board has done so. By statute, the use of model forms is not required, although use of an appropriate model form necessarily complies with the statute. Id. Consumer is correct that use of the H-9 beyond the context for which it was designed would have been improper, but use of the H-8 in an inappropriate context equally violates TILA, and that is the allegation here. Consumer’s correct decision not to use the H-9 cannot justify its use of the H-8 if the H-8 did not clearly disclose Porter’s rescission rights.
Turning to Porter’s argument, we observe that her case does not stand or fall on what notice she could have received, but on the clarity of the notice that she did receive. The mere existence of the H-9 is not enough to demonstrate that the H-8 was inappropriate in her “refinancing” context. Ideally, because neither the H-8 nor the H-9 applied perfectly to the 1987 transaction as structured, Consumer should have provided Porter with its own nonstandard notice form, perhaps a hybrid of the two.[17] But the law does not require an ideal notice of rescission rights, just a clear, accurate, and conspicuous one. To determine whether the notice that Porter did receive was confusing or misleading, we have no choice but to embark on a close reading of that notice, which appears in full at pages 1068-69 but which we excerpt again here for convenience.
The front side of the “Notice of Right to Cancel” that Porter was provided reads, in relevant part:
You are entering into a transaction that will result in a (mortgage/lien/security interest) (on/in) your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last.... If you decide to cancel this *1077 transaction, you may do so by notifying us in writing....
(emphasis added). The back side, labeled “EFFECT OF CANCELLATION,” reads, in relevant part:
If you cancel the transaction, the (mortgage/lien/security interest) is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the (mortgage/lien/security interest) (on/in) your home has been can-celled, and we must return to you any money or property, you have given to us or to anyone else in connection with this transaction.
You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property.... Money must be returned to the creditor. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation,
(emphasis added).
One could read this notice as saying that if Porter elected to rescind, the new money portion would be rescinded and the old loan document (and mortgage) would remain in effect. On that view, the notice told Porter that she entered into a transaction for new money, and that “this transaction” (for new money) could be cancelled. Turning to the back side of the form, if Porter can-celled the transaction, the (new) security interest would also be cancelled within twenty days, but she would have to return any money that she received in connection with “this transaction” — that is, the new money. In short, upon cancellation, the new security interest would be voided and the new money would be returned, leaving the parties where they were before this latest transaction.
But, as Consumer recognizes, that is not the only possible reading of the H-8 notice. Both parties and the district court have in fact interpreted the H-8 as allowing Porter to rescind the whole new security interest, covering both old and new money. On that view, the notice told Porter that she entered into a transaction that would result in Consumer taking a security interest in her home in the amount of the sum of the old and new money. Essentially, “this transaction” would involve a loan of the entire amount, not simply the new money. If the transaction were rescinded, the whole new security interest would be rescinded, and Porter would have to return both the old and the new money.
In our view, both readings are sensible, yet they have quite different legal implications. Under the first reading, which focuses on the loan, Porter would have to return the new money, but the old security interest would remain in place. Under the second, which focuses on the security interest, Porter would have to return both old and new money, and both old and new security interests would be satisfied. Because both readings are plausible, we conclude that the H-8 did not provide Porter with a clear notice of what her right to rescind entailed. More generally, we hold that a lender violates TILA by providing the H-8 notice when the borrower’s right to rescind is limited by the “refinancing” exception of 15 U.S.C.A. § 1635(e)(2).
Consumer correctly notes that TILA does not forbid giving borrowers more than the bare statutory minimum rescission rights. In this case, it suggests that by giving the Porter the H-8, it gave Porter the right to rescind the whole loan (old and new money), and in its view, Porter cannot complain about having the “greater” right to rescind the whole loan instead of the “lesser” statutory right to rescind only the new-money portion. As we have just shown, the H-8 did not clearly give Porter the right to rescind the whole loan. But even if it did, Consumer’s “greater/lesser” argument would still fail because a borrower is not necessarily better off having only the right to rescind the whole loan than having only the right to rescind part of it.
Many borrowers seek refinancings involving additional money precisely because they are cash-strapped. When a borrower rescinds a loan, he or she must return the money borrowed. In the refinancing context, a borrower may want to rescind the *1078 new-money portion of a loan but may not have the funds readily accessible to pay back the old loan immediately. Thus in some cases a borrower would prefer to have the “lesser,” statutory right of partial rescission to the “greater” right of total rescission. Consumer would certainly have complied with TILA if it had given Porter the clear right to choose between partial or total rescission, but it did not do so.[18]
We acknowledge that Consumer’s violation of TILA was probably unintentional, and that Consumer may have relied upon the bankruptcy court’s earlier decisions that similarly structured transactions were not “refinancings” so that the H-8 was an acceptable notice for those transactions. Moreover, Porter herself, like most borrowers, may never have read or been confused by Consumer’s cancellation notice. Nevertheless,
TILA achieves its remedial goals by a system of strict liability in favor of the consumers when mandated disclosures have not been made. A creditor who fails to comply with TILA in any respect is liable to the consumer under the statute regardless of the nature of the violation or the creditor’s intent. “[0]nce the court finds a violation, no matter how technical, it has no discretion with respect to liability.”
Smith v. Fidelity Consumer Discount Co., 898 F.2d 896, 898 (3d Cir.1990) (citations omitted). Our decision thus cannot turn on whether or not Consumer is blameworthy in an abstract sense, or on whether or not Porter has suffered an injustice.
Furthermore, we are confident that this decision will promote TILA’s goal of informed decisionmaking by consumer borrowers. Congress created the statutory right of rescission and required clear disclosure of that right because it thought that borrowers who take out consumer loans should have the chance to rethink those transactions if the titles to their homes will be put at risk. See, for example, S.Rep. No. 96-368, 96th Cong., 2d Sess. 28, reprinted in 1980 U.S.Code Cong. & Admin.News 236, 264. As a result of our holding here, future lenders in Consumer’s position will know that if neither the H-8 nor the H-9 fits a transaction, they must prepare their own notice forms that do clearly explain their borrowers’ statutory rescission rights. As a result of that improved disclosure, future borrowers in Porter’s position will be more likely to understand their statutory rescission rights.
IV. CONCLUSION
For the foregoing reasons, we hold that the 1987 transaction was a “refinancing,” and that Consumer failed to provide Porter with clear notice of her corresponding partial rescission rights. Consumer’s failure extended Porter’s time to request rescission to three years from the date of the 1987 loan. Therefore her 1990 letter request to rescind was timely, and she is now entitled to equitable relief of rescission and other statutory remedies under 15 U.S.C.A. § 1640 for Consumer’s failure to rescind upon request. Accordingly, the order of the district court will be affirmed. The case will be remanded to the bankruptcy court for a determination of the remedies to which Porter may be entitled and for further proceedings regarding the 1988 transaction.[19]

. We take the dollar amounts from Porter’s submissions to the bankruptcy and district courts. While the bankruptcy court did not make findings of fact on the dollar amounts, they do not appear to be disputed, nor are they essential to our analysis.

. 15 U.S.C.A. § 1635(a) reads, in relevant part: Disclosure of obligor’s right to rescind
(a) Except as otherwise provided in this section, in the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this sub-chapter, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.
(emphasis added).

. We will distinguish between Consumer and National, but when we refer generically to "Mid-Penn” or "the Mid-Penn companies" we mean both Mid-Penn Consumer Discount Co. and Mid-Penn National Co. Consumer and National share the same address and evidently have the same officers, but whether they are alter egos is unclear. Whether the Mid-Penn companies are the same lender for TILA purposes is a subject now pending in the bankruptcy court.

. The only differences were the handwritten transaction dates and loan numbers and the substitution of “Mid-Penn National Company" for "Mid-Penn Consumer Discount Company” as the party to be notified of cancellation.

. 15 U.S.C. § 1635(b) provides, in relevant part: Return of money or property following rescission
(b) When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor ... becomes void upon such a rescission. Within 20 days after a receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor’s obligations under this section, the obligor shall tender the property to the creditor....
We note that Porter sought to rescind the 1987 loan from Consumer, even though the 1987 loan and security interest had already been satisfied as a result of the 1988 transaction with National. According to her counsel, she did so to obtain a refund of the finance charge on the 1987 loan. Although we are uncertain whether rescission of a satisfied loan and mortgage makes conceptual sense, Consumer has not raised that as an affirmative defense, and therefore that issue is not before us.

. Porter argued that Mid-Penn did not, in fact, truly intend to allow her to rescind the whole loan. In her view, the fact that Mid-Penn waited until after the three-day rescission period to satisfy the old mortgages was evidence that Mid-Penn was only granting the right to rescind the new-money portion, contrary to the implication of the H-8. Porter sought discovery as to Mid-Penn’s practice with other borrowers, but the bankruptcy court denied her motion to compel because it thought Mid-Penn’s intent irrelevant. Mid-Penn’s intent was a matter of disputed fact at trial, but the bankruptcy court, consistent with its discovery ruling, declined to make a finding on that issue.

. The court borrowed the 45-day period from Pennsylvania law, which requires satisfaction of mortgages within 45 days after request and tender of sums due, 21 Pa.Stat.Ann. §§ 681, 682 (Purdon Supp.1991).

. The bankruptcy court sustained Porter’s objections in Count Five to National's proof of claim, noting that the proof of claim should have been in National’s name, not Consumer’s, because the only debts outstanding were to National. The court subsequently allowed Consumer to refile the claim to correct the technical error. Count Five has therefore been resolved.

. Porter has dropped her Pennsylvania law claims. Uncertain about the finality of the bankruptcy court’s order, Porter commenced a second adversary proceeding, raising identical TILA claims, which the bankruptcy court again rejected. Porter took an appeal of that clearly final order, and the district court consolidated the two appeals.

. National is not a party to the appeal, as the identity-of-lenders issue pertaining to the 1988 transaction is pending in the bankruptcy court. Indeed, no issues regarding the 1988 transaction are before us. Furthermore, because the district court declined to reach Porter’s alternative theory of liability based on the simultaneous *1072 temporary holding of two mortgages, that claim is not before us, either.

. The bankruptcy court has apparently stayed the case pending disposition by this court, believing that our disposition may render those proceedings moot, that its jurisdiction pending appeal to this court is questionable, and that no urgency counsels deciding the lender-identity and remedies issues immediately.

. Neither side disputes that the Board's interpretation of the statute is reasonable.

. Actually, a borrower’s risk may change as a result of an amended payback schedule for the same principal amount, and a borrower might want to rethink such a loan restructuring and return to the status quo ante. But both the statute and regulation prefer a bright-line approach whereby the applicability of the rescission right turns on the advancement of new loan principal.

. Indeed, if borrowers had the right to rescind both new- and old-money portions, many lenders might refuse to offer them refinancings at all for fear of rescission. Because consumer borrowers as a whole often find it advantageous to refinance, as a class they might even prefer to have their rescission rights limited to the new-money portion.

.The relevant portion of the H-9 reads:
You are entering into a new transaction to increase the amount of credit provided to you. We acquired a [mortgage/lien/security interest] [on/in] your home under the original transaction and will retain that [mortgage/Iien/security interest] in the new transaction. You have a legal right under federal law to cancel the new transaction, without cost, within three business days....
If you cancel the new transaction, your cancellation will apply only to the increase in the amount of credit. It will not affect the amount that you presently owe or the [mortgage/lien/security interest] we already have [on/in] your home. If you cancel, the [mortgage/Iien/security interest] as it applies to the increased amount is also cancelled_

. The district court’s reading is also more consistent with the underlying statute, which exempts
a transaction which constitutes a refinancing or consolidation (with no new advances) of the principal balance then due and any unpaid finance charges of an existing extension of credit by the same creditor secured by an interest in the same property. 15 U.S.C.A. § 1635(e)(2). We also read the statute to use "secured by an interest in the same property” to modify the phrase immediately preceding, "an existing extension of credit by the same creditor,” rather than to modify “refinancing,” which appears far earlier in the sentence.

. According to the record, since November 1988 the Mid-Penn companies have in fact used a hybrid notice form that informs borrowers that the prior mortgage will be satisfied within 45 days and that the borrowers have the right to rescind (only) the new money portion of the loan. That notice was not given in this case, however, and thus it is not before us.

. Moreover, like the bankruptcy court, we find it hard to believe that Consumer would actually have let Porter and like borrowers rescind their entire loans after a refinancing, when to do so would not be required by law and would be contrary to Consumer’s economic interest. On the other hand, the Mid-Penn companies have suffered numerous adverse court decisions for technical violations of TILA, and perhaps Consumer adopted such a policy out of an overabundance of caution, especially since re-scissions within the three-day period are rare. Consumer’s probable conduct remains a disputed fact, see note 6, but in view of our conclusion in the text, resolving that dispute is unnecessary.

. The 1988 loan is not before us because the district court remanded that portion of the case *1079 to the bankruptcy court for determination whether Consumer and National were the same lender for purposes of TILA. As the district court observed, the exemption from rescission for "refinancings" only applies if the refinancier and the original lender are the same. See IS U.S.C.A. § 1635(e)(2); 12 CFR § 226.23(f). See also 51 Fed Reg 45296, 45297-98 (Dec 18, 1986) (Board retracts proposal to exempt "refinanc-ings” by nonoriginal creditors). If the two Mid-Penn entities were the same lender, then the 1988 transaction was, like the 1987 transaction, only partially rescindable, and our holding here would control because the 1988 notice was essentially identical to the 1987 notice.
On the other hand, if the two Mid-Penn entities were not the same lender, then the exemption did not apply, and the whole 1988 loan from National was subject to rescission. Our holding here (that the H-8 is inappropriate where the "refinancing” exemption applies) would not cover that circumstance. Nevertheless, the bankruptcy court should not assume that the H-8 is automatically appropriate whenever full rescission rights apply. The test, as always, would be whether the notice was clear in the context in which it was given. Thus the bankruptcy court would still have to determine whether the H-8 that National provided in 1988 unambiguously provided Porter with notice of her (full) rescission rights.