**In re Florence RALLS, Debtor.**

**Florence Ralls, Plaintiff,**

v.

**Bank of New York, as Trustee Under Pooling and Servicing Agreement Dated August 31, 1995, Series 1995–B c/o TMS Mortgage, Inc.,**

**The Money Store Financial Co., Inc,**

and

**Edward Sparkman, Esquire, Defendants.**

**Bankruptcy No. 98–19117DAS.**
**Adversary No. 98–0461.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Feb. 24, 1999.

Mary Jeffery, Philadelphia, PA, for debtor.

Brian H. Smith, Elkins Park, PA, for defendant.

Edward Sparkman, Philadelphia, PA, trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before us is the disposition of an adversary proceeding ("the Proceeding") instituted by FLORENCE RALLS ("the Debtor") against THE BANK OF NEW YORK ("BONY") as Trustee of and doing business of THE MONEY STORE FINANCIAL CO., INC. ("the Defendant")[1] to re-

---

1. The caption of the Debtor's Amended Complaint ("the Complaint") identifies as defendants two distinct entities, BANK OF NEW YORK, AS TRUSTEE UNDER POOLING AND SERVICING AGREEMENT DATED AUGUST 31, 1995, SERIES 1995–B C/O TMS MORTGAGE, INC. and THE MONEY STORE FINANCIAL CO., INC., with the Standing Chapter 13 Trustee, Edward

scind a consumer loan transaction pursuant to the federal Truth in Lending Act 15 U.S.C. § 1601, *et seq.* ("the TILA") and obtain a broad range of remedies as a result.

We hold that the Defendant did in fact commit material violations of the TILA justifying rescission in connection with the loan transaction issued by having the Debtor execute numerous documents which described a transaction which, while similar to the transaction's conception by the Debtor, was inconsistent with certain other documents and the only TILA disclosure statement given to the Debtor, the latter of which described terms less favorable then those understood by the Debtor. We further hold that the Defendant failed to present evidence which would support defenses under 15 U.S.C. §§ 1640(b) (correction of errors) or § 1640(c) (unintentional violations).

The Debtor's rather skimpy evidence suggests that the Defendant's assignor may have intended to cheat or deceive the Debtor in this transaction by attempting to enforce against her less favorable terms than the Debtor understood. However, the absence of actual proof of same causes us to refrain from ordering the harsh relief of compelling the Defendant to return the entire sum paid to it by Debtor to date. However, all other, more typical relief flowing from a valid but ignored TILA rescission will be granted, *i.e.,* elimination of the security interest supporting a secured claim, reduction of the claim in certain respects, statutory damages for refusing the rescission, and attorneys' fees.

## B. *PROCEDURAL AND FACTUAL HISTORY*

The Debtor filed the underlying individual Chapter 13 bankruptcy case on July 17, 1998. The instant Proceeding was filed on August 18, 1998, naming only the Defendant and the Trustee as defendants. The Proceeding was listed for trial on November 19, 1998, well prior to the initial scheduled confirmation hearing date of December 17, 1998.

Sparkman, Esquire ("the Trustee"), who has not participated in the Proceeding. The Complaint, however, in its first paragraph, indicates that relief is sought only against the Defendant, acting as BONY's agent. Only the Defendant filed the

On October 19, 1998, the Complaint was amended to add BONY as a party defendant. The Defendant responded with a motion to dismiss the Complaint filed on November 13, 1998. The motion to dismiss was based on 15 U.S.C. § 1635(f), which provides that a right to rescission expires if not asserted within three years from the transaction. The Defendant argued that the underlying transaction occurred on July 27, 1995, more than three years before the Proceeding was filed. In an Order of November 17, 1998, this motion was denied because the Complaint alleged that the Debtor's counsel had effected rescission by a letter of July 14, 1998, within three years from July 27, 1995. We noted that § 1635 makes no reference to when a suit based on 15 U.S.C. § 1635 must be commenced, citing *Beach v. Ocwen Federal Bank,* 523 U.S. 410, 118 S.Ct. 1408, 1412, 140 L.Ed.2d 566 (1998). We pointed out that, as long as an action seeking damages for failing to effect a rescission in response to a valid demand for same were filed within one year of the attempted rescission, it was timely under 15 U.S.C. § 1640(e). *See, e.g., Reid v. Liberty Consumer Discount Co.,* 484 F.Supp. 435, 441 (E.D.Pa.1980); and *In re Tucker,* 74 B.R. 923, 932 (Bankr.E.D.Pa. 1987).

An Answer to the Complaint was filed, as required, on November 18, 1998. At the parties' mutual request, we continued the trial to January 14, 1999, on a must-be-heard basis. We were unwilling to continue the Proceeding further due to our recognition that the confirmation hearing would be put off until after the Proceeding was tried, briefed, and decided. The confirmation hearing is now in fact scheduled on February 25, 1999. It is also important to note that, on December 14, 1998, the Defendant filed a Proof of Claim allegedly secured by a residential mortgage arising out of the July 27, 1995, transaction, reciting $43,855.67 as the principal amount of its indebtedness and $11,677.54 as arrearages.

proof of claim which is under attack in the Proceeding. We will therefore grant relief as to against the Defendant only under the assumption that, in doing so, we are granting complete relief to the Debtor.

A two-hour trial of the Proceeding was conducted on January 14, 1999. Testimony was adduced from the Debtor; Gilbert Castro, the Defendant's vice-president for regional sales; and, Regina Bolger, an employee of Gelt Financial, Inc. ("Gelt"), the Defendant's assignor, who is responsible for processing and closing Gelt's loan applications. However, Castro's attempts to testify regarding the loan transaction were properly objected to because he lacked personal knowledge of the transaction, was not the custodian of records, and could not authenticate any records that he had with him. Much of Bolger's proffered testimony was also disallowed on objection because she did not commence work for Gelt until 1996, a year after the transaction in question. Bolger was permitted to testify that Gelt had "purged" its file and hence had no documentation in hand regarding it. Although not herself employed in Gelt's "post closing department," she was permitted to testify as follows regarding that department's activities:

Q. [by the Defendant's counsel] Do you have policies or procedures in place at Gelt to guard against calculation computer errors?

A. [by Bolger] the usual course is, after the loan closes, there is what's called a post closing department, which checks all the loans and everything, their signatures, etcetera, and everything on the documents.

At that time, if they find something wrong, they will go ahead and contact the borrower or send a letter with the corrected documents, and request for signature, and copies for the borrower.

Q. And approximately when would that be done, just on the average?

A. Probably within a week or two after closing.

Q. And once again, it would be some form of written correspondence, not a phone call.

A. Right.

Q. Okay.

A. Usually.

The Debtor testified that she and her apparently-estranged husband, David Ralls, are the owners of a single family home in Philadelphia, Pennsylvania at 5840 Angora Terrace ("the Home") where she resides. She testified that the Home is presently valued at $43,000. In summer 1995, the Debtor applied to a company known as Credit–Tech ("Tech") to assist her in obtaining a fifteen-year loan in the principal amount of $32,250 to consolidate her existing debts and make repairs to the Home. We note that the parties' Loan Application does indeed reference a loan in the amount of $32,250 at an interest rate of 14.990, although it also states that the contemplated loan would require 360 months or thirty years of payments.

With the understanding that she would receive a loan in the terms that she requested, the Debtor and later her husband appeared at the office of Gelt on July 27, 1995. At trial, the Debtor produced a package of papers which she allegedly received that date, which included the following:

(1) Balloon Notes (two separate and differently-completed documents are so headed);

(2) Servicing Disclosure Statement;

(3) Truth in Lending Disclosure Statement (Real Estate, ("the D/S"));

(4) Notice of Right to Cancel;

(5) Settlement Statement;

(6) Mortgage;

(7) Affidavit and Agreement;

(8) A letter dated July 27, 1995, indicating the amount of the payment due on the first day of each month.

One of the Balloon Notes, the Affidavit and Agreement, and the letter all state that the Debtor was obliged to make monthly payments of $451.15. However, the other Balloon Note provides for monthly payments of $407.53. The D/S indicates that 180 monthly installments of $407.53 at a yearly interest rate of 15.231 percent plus a single balloon payment of $29,536.19 are to be paid. None of the other documents indicate a payment amount or term. More comparative detail is provided in the TABLE and discussion at page 516 *infra*. The Debtor testified that she believed that she applied for and agreed to pay off the entire loan balance at $32,250 over a fifteen-year period, and that her

monthly payments to accomplish this would be $451.15. She indicated that she had no idea that a large payment would be due at any time, stating that she was at that time totally unfamiliar with the meaning of the term "balloon payment."

The Debtor further testified that, several days after the transaction occurred, a Tech representative contacted her by telephone and asked her if she would like to have her monthly payments reduced to $407.53, instead of the $451.15 as agreed upon at settlement. Advised of no other changes in terms, the Debtor quite naturally agreed. Thereafter, on August 11, 1995, Gelt sent a letter in the same form as that given at settlement, stating that the new amount of the payments would be $407.53. No other documents were provided to her by Gelt at this time. Gelt then proceeded, on August 31, 1995, to assign the loan to the Defendant.

The Debtor commenced the $407.53 payments. However on February 1, 1997, she defaulted. Three months later, the Defendant filed a state-court foreclosure action against her. She failed to respond to the complaint, a default judgment was entered against her, and the Home was scheduled for sheriff's sale. On July 14, 1998, prior to the sale and just prior to the bankruptcy filing, the Debtor, by her counsel's letter, sought to rescind the loan in question on the ground that Gelt had violated the TILA by failing to accurately disclose the amount financed, the finance charge, the annual percentage rate, and the schedule of payments in the loan transaction. The Defendant did not respond in any way to this letter. The filing of the Proceeding followed.

After the completion of the trial on January 14, 1999, the parties agreed that the Debtor's brief would be submitted by February 4, 1999, and that the Defendant would file its opposing brief by February 12, 1999. Both parties complied with these deadlines in rendering their respective submissions.

In her brief, the Debtor asserts that the Defendant failed to provide her with the 15–year term to repay her entire obligation, without any extra or balloon payment for which she applied and for which she was led to believe that she had contracted. She also argues that her understanding of the transaction and many of the documents executed are inconsistent with the D/S, justifying her rescission. The Debtor also points out that the transaction as described in the D/S, distinctly contrary to her understanding, left her with a huge balloon payment obligation which was calculated to encumber the Home for her entire lifetime. She further argues that the total of payments and finance charges are mathematically inaccurate. As a result, she contends that she is entitled to rescission of the transaction at issue, cancellation of the mortgage in question, statutory damages of $2,000, return of her payments in the agreed amount $5699.18, recoupment of $2,000 against the defendant's claim, and reasonable attorneys' fees.

The Defendant, in its brief, notes that the loan application states that the Debtor applied for a 30–year loan and agreed to payments of $407.53. Without mentioning the inconsistencies in the documents, see pages 513–14 *supra* and 516 *infra*, it faults her for not reading papers which it contends support its hypothesis that the D/S accurately describes the transaction as requiring 15 years of payments of $407.53 and a balloon payment of over $29,500. It argues that the letter of August 11, 1995, corrected its errors in reciting the monthly payments as $451.15 in certain of the documents. Invoking 15 U.S.C. § 1640(c), but not specifically referencing § 1640(b), the Defendant asserts that any errors by Gelt in providing TILA disclosures were proven to be unintentional and to have been no more than clerical or mathematical errors in the amortization of the Debtor's loan on its part. Accordingly, the Defendant argues that the Debtor's claims under the TILA must fail.

### C. DISCUSSION

1. *The Information Contained in the Only TILA Disclosure Statement presented to the Debtor in Connection with the Transaction, Being Inconsistent with the Significant Terms of the Transaction as Set Forth in Other Documents, Failed to Comply with the Statutory Requirements Mandated by The TILA.*

At issue is whether the disclosures contained in the D/S, and hence given to the

Debtor in connection with the July 27, 1995, transaction, sufficiently provided the Debtor with the material disclosures required by the TILA and its accompanying Regulations. The Debtor contends that the D/S failed to accurately disclose (1) the payment schedule, (2) the total of payments, and (3) the finance charge that eventually would be applicable to the loan obtained. These disclosures, if in fact inaccurate, would clearly constitute "material" disclosure violations which would justify a rescission. *See* 15 U.S.C. § 1602(u) (the finance charge, the total of payments, and the due dates or periods of payments to repay are among the "material disclosures" which must be accurate to preclude a rescission under 15 U.S.C. § 1635(a)). The Debtor argues that the evidence and testimony presented at trial regarding discrepancies and inconsistencies in the documents and the Debtor's confusion in light of same indicates that the payment schedule and other terms embodied in the D/S did not adequately explain the schedule of payments and other terms contemplated by the parties at the time of settlement.

The Defendant, on the other hand, argues that the TILA clearly recognizes that "[t]he informed use of credit results from an awareness of the cost thereof by consumers." 15 U.S.C. § 1601(a). From this, the Defendant contends that the Debtor's failure to read the D/S as prevailing in the event of inconsistencies in the documents provided at settlement precludes the Debtor from arguing that she was not aware or informed about the terms of the loan obtained.

■ We believe that the Debtor's position with respect to the effect of the disclosures contained in the D/S which are inconsistent with the terms of other documents executed in connection with the transaction is supported by the caselaw interpreting the TILA. The courts in this Circuit have thusly recognized that the purpose of the TILA is to inform consumers of the true cost of credit:

> "The Truth in Lending Act was passed primarily to aid the unsophisticated consumer so that he would not be easily misled as to the total costs of financing... Thus, the Act seeks 'to assure a meaningful disclosure of credit terms so that the

consumer will be able to compare more readily the various terms available to him and avoid the uninformed use of credit.'" 15 U.S.C. § 1601. *Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246, 248 (3d Cir.1980). *See also, Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 896, 898 (3d Cir.1990), *aff'd in part & superseded in part*, 898 F.2d 907 (3d Cir.1990); *In re Woolaghan*, 140 B.R. 377, 382 (Bankr.W.D.Pa.1992); *In re Steinbrecher*, 110 B.R. 155, 160–161 (Bankr. E.D.Pa.1990); *In re McCausland*, 63 B.R. 665, 667 (Bankr.E.D.Pa.1986); and *In re Perry*, 59 B.R. 947, 948–949 (Bankr.E.D.Pa. 1986).

■ To accomplish its purpose, the TILA and its implementing Regulation Z require lenders to disclose to consumers certain material terms clearly and conspicuously in writing, in a form that the consumer may examine and retain for reference. *See* 15 U.S.C. 1638(b)(1); 12 C.F.R. § 226.17(a)(1); and *Wright v. Mid–Penn Consumer Discount Co.*, 133 B.R. 704, 707–08 (E.D.Pa. 1991). *See also Nichols v. Mid–Penn Consumer Discount Co.*, 1989 WL 46682, at *3 (E.D.Pa. Apr. 28, 1989) ("[T]he TILA and Reg. Z ... guarantee ... meaningful disclosure of credit terms by requiring the creditor to give the borrower a Disclosure Statement specifying the credit terms in clear and straightforward language.") The material terms that must be disclosed to create liability include the amount financed, the finance charge, the annual percentage rate, the payment schedule, and the total of payments, and are referenced in 15 U.S.C. §§ 1602(u) and 1638(a).

■ The statute and its implementing Regulations require that the disclosures must be made before "credit is extended" to the consumer. *See* 15 U.S.C. § 1638(b)(1); and 12 C.F.R. § 226.17(b). That is, the required disclosures must be provided before consummation of the transaction occurs. *See Shepeard v. Quality Siding & Window Factory, Inc.*, 730 F.Supp. 1295, 1300 (D.Del. 1990). Moreover, the material disclosures provided must reflect the actual terms of the legal obligation between the parties. *See* 12 C.F.R. § 226.17(c)(1). *See also Hubbard v. Fidelity Federal Bank*, 91 F.3d 75, 78 (9th

Cir.1996) ("TILA regulations require [the lender] to make disclosures that 'reflect the terms of the legal obligation between the parties.' ") With these general principles in mind, we proceed to the issues before us.

In the instant case, the Debtor testified that she applied for a closed-end fixed-rate home improvement loan to consolidate her existing debts and fix her marital residence. As advanced by the Debtor's credible testi-mony presented at trial, the parties mutually agreed to a fifteen-year obligation consisting of 180 monthly payments of $451.15 at a fixed-interest rate of 14.990 percent. The evidence and testimony presented at trial also showed that, on July 27, 1995, the par-ties consummated the transaction at hand. On that same date, the Debtor received docu-ments, the terms of which are illustrated in the following TABLE:

| DOCUMENT | APR | FINANCE CHARGE | AMOUNT FINANCED | TOTAL OF PAYMENTS | PAYMENT SCHEDULE |
|---|---|---|---|---|---|
| Uniform Residential Loan-Application | 14.990% | NONE | NONE | NONE | 360 PAYMENTS |
| Mortgage | NONE | NONE | $32,250 | NONE | UNDISCLOSED # OF PAYMENTS AT $451.15 |
| First Balloon Note | 14.990% | $81,207.00 | $32,250 | $113,457.00 | 180 PAYMENTS AT $451.15 /MONTH |
| Second Balloon Note | 14.990% | NONE | $32,250 | NONE | 180 PAYMENTS AT $407.53 /MONTH |
| Servicing Disclosure Statement | NONE | NONE | NONE | NONE | NONE |
| TILA Disclosure Statement | 15.321% | $70,849.70 | $31,634.36 | $102,484.06 | 179 PAYMENTS AT — $407.53 1 PAYMENT AT — $29,536.19 |
| Notice of Right to Cancel | NONE | NONE | NONE | NONE | NONE |
| Loan Settlement Statement | NONE | NONE | $32,250 | NONE | NONE |
| Written Statement Provided by Gelt | NONE | NONE | NONE | NONE | UNDISCLOSED # OF PAYMENTS AT $451.15 |

As the TABLE demonstrates, the Debtor received eight documents in addition to the D/S at the time of the consummation of the transaction. A close scrutiny of the D/S reveals that it contradicts the information embodied in several, if not most, of the other eight documents. In other words, the D/S issued by Gelt "discloses" information which is different from that which appears, per the other documents, to have been actually con-templated by the parties in the transaction.

■ "The cardinal principle of the TILA and its Regulations is making sure that [all the documents issued in a given transaction and the disclosure statement] are *identical*, with the disclosure statement being more clearly worded and perhaps shorter, but pro-viding accurate information in order that the consumer can refer to it as a benchmark in his or her hypothetical 'shop for credit.' " *In re Martin*, 72 B.R. 126, 127–128 (Bankr. E.D.Pa.1987) (emphasis added). *See also Horizon Financial, F.A. v. Norris*, 138 B.R. 467, 469, 471–72 (E.D.Pa.1992) (over-inclusive disclosure violates TILA because it is not consistent with the loan documents); *Jenkins v. Landmark Mortgage Corp. of Va.*, 696 F.Supp. 1089, 1092–94 (W.D.Va.1988) (disclo-sure statement inconsistent with oral disclo-sures provided to the debtor creates liabili-ty); *In re Johnson–Allen*, 67 B.R. 968, 971–74 (Bankr.E.D.Pa.1986) (over-inclusive dis-closure of security interest violates TILA because it is inconsistent with the security interests actually taken by the creditor); and *McCausland, supra*, 63 B.R. at 667 ("the TILA requires a creditor to issue the debtor a disclosure statement summarizing certain information found in the loan documents").

■■ There is hence little question that the Defendant's providing a D/S which was inconsistent with several of the material terms set forth in certain of the significant

loan documents violates the basic principles of TILA and the legislative purpose behind the statute. *Cf. Dzadovsky v. Lyons Ford Sales, Inc.*, 593 F.2d 538, 539 (3d Cir.1979). Once a violation is found, liability is imposed regardless of whether the disclosure statement is over- or under-inclusive and whether the creditor's conduct was actually damaging, intentional, negligent, or none of the above. *See e.g., Porter v. Mid–Penn Consumer Discount Co.*, 961 F.2d 1066, 1069 (3d Cir.1992). Thus, we conclude that, absent a statutory defense, the contradictions between the material terms of the D/S provided and the terms agreed upon by the parties in the instant transaction, as reflected in testimony and other documentation, are sufficient to trigger the Debtor's rescission rights under § 1635(f).

■ The Defendant's counter-argument that the Debtor's failure to read the D/S caused her confusion and should preclude her from arguing that she was not aware or informed about the terms of the loan obtained has no merit for several reasons. First, it has been repeatedly held by the courts in this Circuit that it is not necessary for the consumer to be actually deceived in order to find a violation of the federal statute. *See Steinbrecher, supra*, 110 B.R. at 161. *See also Griggs v. Provident Consumer Discount Co.*, 680 F.2d 927, 932–933 (3d Cir. 1982), *vacated on other grounds*, 459 U.S. 56, 103 S.Ct. 400, 74 L.Ed.2d 225, (1982); and *Dzadovsky, supra*, 593 F.2d at 539. *Accord, Zamarippa v. Cy's Car Sales, Inc.*, 674 F.2d 877, 879 (11th Cir.1982); and *Smith v. Chapman*, 614 F.2d 968, 971 (5th Cir.1980). Indeed, to find a violation of the TILA and/or Regulation Z, we need not conclude that the Debtor was even aware about the information contained in the D/S. It is sufficient that the information in question "be stated … so as to … contradict … the information required by this part to be disclosed." 12 C.F.R. § 226.6(c) (emphasis added). *See also Rainey v. Credithrift of America # 5 Inc.*, 441 So.2d 278, 283 (1983).

Moreover, here, the inconsistencies among the terms of the various loan documents assures that, even had the Debtor carefully read and thoroughly understood each and every document which she received, she would have nevertheless been unable to ascertain which of these documents were accurate and hence correctly portrayed the terms of the loan transaction at issue. At best, discovering these inconsistencies would have caused her to be uncertain as to the actual terms of the transaction.

Finally, and apparently because of the cacophony of loan terms referenced in the various documents, the instant Debtor testified credibly that she was deceived, or at best confused, about the contract terms. Therefore, in this scenario it cannot accurately be said that the violations were technical in nature and caused no actual harm to the Debtor.

The only defenses to the conclusion that the presence of TILA violations in the D/S which rendered the transaction rescindable other than the meritless argument that the Debtor should have discovered the disclosure violations are the defenses which are based upon § 1640(c) and possibly § 1640(b). In the subsequent headnote, we address these defenses.

2. *The Defendant Clearly Did Not Establish that Gelt Corrected Its TILA Errors, or that the Violations Were Unintentional, Bona Fide Errors.*

The TILA, at 15 U.S.C. §§ 1640(b), (c), provides for the following defenses:

**(b) Correction of errors**

A creditor or assignee has no liability under this section or section 1607 of this title or section 1611 of this title for any failure to comply with any requirement imposed under this part or part E of this subchapter, if within sixty days after discovering an error, whether pursuant to a final written examination report or notice issued under section 1607(e)(1) of this title or through the creditor's or assignee's own procedures, and prior to the institution of an action under this section or the receipt of written notice of the error from the obligor, the creditor or assignee notifies the person concerned of the error and makes whatever adjustments in the appropriate account

are necessary to assure that the person will not be required to pay an amount in excess of the charge actually disclosed, or the dollar equivalent of the annual percentage rate actually disclosed, whichever is lower.

**(c) Unintentional violations; bona fide errors**

A creditor or assignee may not be held liable in any action brought under this section or section 1635 of this title for a violation of this subchapter if the creditor or assignee shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error. Examples of a bona fide error include but are not limited to, clerical, calculation, computer malfunction and programming, and printing errors, except that an error of legal judgment with respect to a person's obligations under this subchapter is not a bona fide error.

The Defendant notes that one of the Balloon Notes signed by the Debtor did provide, consistently with the DS, for monthly payments of $407.53. While acknowledging that the Debtor "erroneously" signed another Balloon Note providing for a monthly-payment obligation of $451.15, and that this payment amount was supported by the letter setting forth the payment amount dated July 27, 1995, the Defendant argues that Gelt promptly corrected the error set forth in the latter by issuing a new letter dated August 11, 1995, setting forth $407.53 as the payment amount. Moreover, this August 11 letter contained a signature line for the Debtor to sign as an acknowledgment, which she did.

However, the Defendant has not alleged that it took any other actions on August 11. In describing the limited scope of § 1640(b), the *Thomka* court, 619 F.2d at 251–52, states as follows:

Section 1640(b) itself states that when a notice of error has been made, the creditor must make "whatever adjustments in the appropriate account (that) are necessary to insure that the person will not be required to pay a finance charge in excess of the

amount or percentage rate actually disclosed." The provision thus refers to mathematical, not informational errors generally. Notice in a case such as this where there were informational errors would be ineffectual, since there are no lower mathematical figures on which the remedial cost would be calculated. It is therefore possible that providing exemption under Section 1640(b) in cases like this would provide an incentive for lenders to delay sending disclosure forms until after the agreement is reached. In *Jumbo v. Nester Motors, Inc.*, 428 F.Supp. 1085 (D.Ariz.1977), the court reached a similar conclusion. It held that the belated delivery to the consumer of a required security agreement did not satisfy Section 1640(b). To apply the exception in Section 1640(b) to this requirement would effectively nullify the regulation, the court concluded, "because lenders would be granted an automatic extension of time not contemplated by the regulations." 428 F.Supp. at 1087.

From the foregoing, it can be noted that § 1640(b) requires not only that the person concerned be notified of the error, but that the creditor "makes whatever adjustments in the appropriate account are necessary to assure that the person will not be required to pay an amount in excess of the charge actually disclosed." The August 11, 1995, notice did not explain the significance of the correction. Nor were corrections in the amount charged made. The Debtor credibly testified that, per the explanation of the Tech representative, she believed that the payment amount change merely reflected a reduction in the payments that she was obliged to make, and it therefore did not change her misunderstandings that the loan was to be liquidated by monthly payments over 15 years.

A serious question arises whether this letter was therefore effectual notice to the Debtor that a significant charge in payment terms had occurred. In light of the confusion generated by Gelt's inconsistent documentation of the loan, we find that the latter notice which merely "corrected" the payment amount was grossly inadequate under the standards enunciated in *Thomka*. Further-

more, as *Thomka* indicates, there were no prerequisite "adjustments" effected in the account to "assure" that the Debtor was not paying more in the transaction than she believed was appropriate. Perhaps because of these deficiencies in the correction process which renders it applicable, the Defendant did not expressly invoke § 1640(b) in its defense.

The Defendant did, however, expressly reference § 1640(c). The dispatch of the August 11, 1995, letter is referenced again, this time in support of an argument that, if an error was indeed made by Gelt as to the monthly payment obligation disclosure, that error was nothing more than an unintentional clerical or calculation error on Gelt's part. In support of this argument, the Defendant observes that Gelt: (1) with no prompting on the Debtor's part, quickly corrected the error in question; (2) had the Debtor to sign the August 11, 1995, written statement; and (3) maintained procedures to guard against clerical/computation errors in the preparation of all its loan documents. The Defendant then concludes that it cannot be held liable under the TILA, citing *Ballew v. Associates Financial Services Co. of Nebraska, Inc.*, 450 F.Supp. 253, 271 (D.Neb.1976) (clerical error which creditor corrected within fifteen days held not to violate the TILA).

The Debtor, on the other hand, asserts that the Defendant's attempted § 1640(c) defenses must fail. To support her contention, the Debtor argues that: (1) the "bona fide error" defense was waived when the Defendant failed to raise the same in its Answer to the Complaint submitted on November 18, 1998; (2) there was no evidence submitted at trial to support the Defendant's contention that the alleged error was unintentional in nature; (3) the alleged error was not within those generally contemplated by the available statutory defense; (4) the Defendant's "preventive procedures" evidence consisted of merely vague statements made by a Gelt employee who did not even work in the "post closing department" that would have been responsible for such corrections; and (5) the Defendant's contention that it promptly corrected the "error" at hand solely applies to the correction of disclosure statements, not

to changes in the terms of the transaction obtained.

 We find that the Debtor's position with respect to the remedies requested is correct. The law clearly holds that TILA must be strictly construed, and that liability must be imposed for any TILA violation, no matter how technical. *Thomka, supra,* 619 F.2d at 248–50. *See also Grant v. Imperial Motors,* 539 F.2d 506, 510 (5th Cir.1976); *Norris, supra,* 138 B.R. at 471–72; *Lauletta v. Valley Buick, Inc.,* 421 F.Supp. 1036, 1040 (W.D.Pa.1976); and *In re McElvany,* 98 B.R. 237, 240 (Bankr.W.D.Pa.1989). Statutory damages are awarded in any case in which the creditor violates the specified provisions of the Act, regardless of whether the creditor's conduct was intentional, negligent, or inadvertent. *Newton v. United Companies Financial Corp.,* 24 F.Supp.2d 444, 451 (E.D.Pa.1998). *See also Porter, supra,* 961 F.2d at 1069; *Smith, supra,* 898 F.2d at 903; and *Thomka, supra,* 619 F.2d at 249–50. This strict liability in favor of consumers subjected to TILA violations is released only in narrow circumstances, strictly construed.

The limited nature of the § 1640(c) defense is addressed at some length in *Thomka, supra,* when that court states as follows, 619 F.2d at 250–51:

> The bona fide error defense of Section 1640(c) requires the creditor to show "by a preponderance of the evidence" that the violation "was not intentional, and resulted from a bona fide error;" and second, that it occurred "notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."
>
> However, the first part of the defense that a "bona fide error" occurred has been interpreted to require a showing that the error was merely clerical. *See, e.g., McGowan v. King, Inc.,* 569 F.2d 845, 849 (5th Cir.1978); *Ives v. W.T. Grant Co.,* 522 F.2d 749, 757–58 (2d Cir.1975); *Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161, 1167 (7th Cir.1974); *Ratner v. Chemical Bank,* 329 F.Supp. 270, 281–82 and n. 17 (S.D.N.Y.1971). The original draft of the Act permitted no errors, but, in response to fears that simple clerical mistakes in mathematical calculations of the

lease financial charge and annual percentage rate would create unavoidable liability, see Hearings on S.5 Before the Subcomm. on Financial Institutions of the Senate Comm. On Banking & Currency, 90th Cong., 1st Sess. 64ff., 226, 374, 426–27, 529, 584, 698 (1967), the affirmative defenses of Section 1640(c), as well as of Section 1040(b), were added. *See Ratner v. Chemical Bank,* 329 F.Supp. at 280–81 and n. 17 (discussing legislative history). The present failure of the underlying agreement to conform in numerous respects to the requirements of the Act is surely not a "clerical" error and thus does not fall within the exemption of the Section. *See Hinkle v. Rock Springs National Bank,* 538 F.2d 295, 297 (10th Cir.1976) (not allowing clerical defense where there was a complete failure to disclose in the documents provided); *Palmer v. Wilson,* 502 F.2d at 861 (omission of certain terms is standard agreement not type of clerical error contemplated by Section 1640(c)); *Jumbo v. Nester Motors, Inc.,* 428 F.Supp. 1085, 1086 (D.Ariz.1977) (failure of the lessor to give the plaintiff a copy of the lease finance agreement on the day of the sale "is not the kind of clerical error exempted from liability by 15 U.S.C. § 1640(c).")

Even if [the creditor] prevailed on this point, it cannot meet the second part of the requirement that it demonstrate by a preponderance of the evidence that the error occurred "notwithstanding the maintenance of procedures reasonable adapted to avoid any such error." The requirement has been construed strictly by the courts to require that a special system be established to assure that no initial errors occur, and that a checking mechanism be maintained to catch any errors that slip through the system. *Gallegos v. Stokes,* 593 F.2d 372, 376 (10th Cir.1979); *Mirabal v. General Motors Acceptance Corp.,* 537 F.2d 871, 876–79 (7th Cir.1976); *Turner v. Firestone Tire & Rubber Co.,* 537 F.2d 1296, 1297–98 (5th Cir.1976).

*See also James v. City Home Service, Inc.,* 712 F.2d 193, 194–95 (5th Cir.1983); and *Villanueva v. Motor Town, Inc.,* 619 F.2d 632, 635 (7th Cir.1980).

Since the "error" of Gelt in the instant transaction was of an "informational" nature, not merely "clerical," the § 1640(c) defense is inapplicable. It is important to note that providing the necessary disclosures by telephone at a later time or by typing them into a corrected written notice at a later date is generally insufficient because of the TILA's timing requirements. The language of the regulations does not permit later disclosures. "The creditor shall make disclosures *before* consummation of the transaction." 12 C.F.R. § 226.17(b) (emphasis added). The statute has a similar provision: "Except as otherwise provided in this part, the disclosures required under subsection (a) of this section shall be made *before* the credit is extended." 15 U.S.C. § 1638(b)(1) (emphasis added). *See also, Graves v. Tru–Link Fence Co.,* 905 F.Supp. 515, 519 (N.D.Ill. 1995). In sum, any disclosures made after the parties entered and signed the consumer loan transaction are not disclosures which meet the terms of TILA and its implementing regulations. Therefore, Defendant's contentions are largely inapplicable to the case at hand.

The Defendant's invocation of § 1640(c) must fail for another reason. To utilize this defense, a creditor must establish procedures reasonably adapted to avoid errors by a preponderance of the evidence. No statutory guidelines indicate precisely what such procedures must consist of or how they must be proven. However, generally, creditors must show procedures "designed to avoid and prevent error which might slip through procedures aimed at good faith compliance, 'a safety catch or a re-checking mechanism.'" *Gallegos v. Stokes,* 593 F.2d 372, 376 (10th Cir.1979), quoting *Mirabal supra,* 537 F.2d at 878. Business procedures which have satisfied this requirement in other circumstances include having the work of one well-trained clerk double-checked by another, *see id.,* and proofreading of the agreement. *See Henning v. Daniels,* 653 F.2d 104 (4th Cir.1981). Creditors must also demonstrate that such procedures are regularly maintained to catch errors. *Mirabal, supra,* 537 F.2d at 877.

In the instant case, the Defendant failed to prove that any of the aforemen-

tioned business procedures were ever implemented to avoid the error at hand. Neither double-checking nor proofreading were even mentioned by Bolger. To the contrary, as noted by the Debtor, Bolger's testimony, reprinted in its entirety at page 513 *supra,* consisted merely of vague statements made by an employee who started working for Gelt after the facts in question transpired in a capacity unrelated to error-correction.

The instant failure of the D/S to conform to the loan documents is therefore not a "clerical" error and for this and other reasons this "error" does not fall within the exemption of § 1640(c). In addition to *Thomka, supra,* 619 F.2d at 251, *see also Hinkle supra,* 538 F.2d 295 at 297 (not upholding the clerical defense where there was a complete failure to disclose in the documents provided); *Palmer v. Wilson,* 502 F.2d 860, 861 (9th Cir.1974) (omission of certain terms in a standard agreement not type of clerical error contemplated by Section 1640(c)); *Jumbo, supra,* 428 F.Supp. at 1086 (failure of the lessor to give the plaintiff a copy of the lease finance agreement on the day of the sale "is not the kind of clerical error exempted from liability by 15 U.S.C. § 1640(c)"); and *In re Sherman,* 13 B.R. 259, 262 (Bankr.D.R.I.1981) (inadequate description of security interest taken by creditor is not type of clerical error intended to be included within bona fide error defense of TILA). We consequently conclude rather easily, for a number or reasons, that no viable defenses available to the Defendant appear in §§ 1640(b) or (c) or elsewhere. The Defendant is therefore liable for the consequences of the material disclosure violations which are present in the D/S, justifying the Debtor's invocation of the full panoply of remedies for rescission arising from 15 U.S.C. §§ 1635(a), (b) and 12 C.F.R. § 226.23.

3. *The Debtor Is Entitled to Reclassification and Reduction of the Defendant's Proof of Claim, Statutory Damages, and Attorneys' Fees, but Not Recovery of Her Payments Made, But the Consequences of This Result on the Confirmation Process Is Not Totally Clear.*

Ascertainment of the consequences of our finding that the Debtor had a valid right to rescind the transaction at issue which the Defendant refused to appropriately acknowledge requires resort to the provisions of 15 U.S.C. § 1635(b) and 12 C.F.R. § 226.23(d), which provide as follows:

**§ 1635. Right of rescission as to certain transactions . . .**

**(b) Return of money or property following rescission**

When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest down payment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest in created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor. If the creditor does not take possession of the property within twenty days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

**(c) 226.23 Right of rescission**

. . .

(d) Effects of rescission

(1) When a consumer rescinds a transaction, the security interest giving

rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

(2) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

(3) If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph (d)(2) of this section. When the creditor has complied with the paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender is reasonable value. At the consumer's option tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's place of business. If the creditor does not take possession of the money or property within 20 days after the consumer's tender, the consumer may keep it without further obligation.

(4) The procedures outlined in paragraphs (d)(2) and (3) may be modified by court order.

Unfortunately, neither party has discussed the issues of the consequences of an effective rescission by the Debtor in depth in their briefs. The Debtor indicates that she believes that she is entitled to cancellation of the Defendant's security interest, statutory damages of $2000, a return of her payments of $5699.18, a reduction of the Defendant's remaining unsecured claim by $2000 in the nature of recoupment, and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1640(a). However, no reference to the prospects of confirmation of the Debtor's plan is made. The Defendant does not discuss the issue of remedies at all.

This court has discussed the consequences of a valid rescission which a creditor refuses to acknowledge or to properly act upon within the requisite twenty-day period allotted for doing so by 15 U.S.C. § 1635(b) and 12 C.F.R. § 226.23(d)(2), and has pointed out that they are "severe" and multifaceted. *See, e.g., In re Moore, supra,* 117 B.R. 135, 141 (Bankr.E.D.Pa.1990) and *In re Brown,* 106 B.R. 852, 862 (Bankr.E.D.Pa.1989).

■ First, the security interest taken by the Defendant against the Debtor's residence is terminated. 15 U.S.C. § 1635(b), and 12 C.F.R. § 226.23(d)(1). *See In re Perkins,* 106 B.R. 863, 874 (Bankr.E.D.Pa.1989); *Brown, supra,* 106 B.R. at 862; *In re Celona,* 90 B.R. 104, 115 (Bankr.E.D.Pa.1988), *aff'd sub nom. Celona v. Equitable National Bank,* 98 B.R. 705 (E.D.Pa.1989); *In re Gurst,* 79 B.R. 969, 978 (Bankr.E.D.Pa.1987), *appeals dismissed,* 866 F.2d 1410 (3d Cir. 1988); and 88 B.R. 57 (E.D.Pa.1988); *In re Melvin,* 75 B.R. 952, 958 (Bankr.E.D.Pa. 1987); and *Tucker, supra,* 74 B.R. at 932. We recognize that, in the context of a Chapter 13 bankruptcy case, the ramifications of this consequence are in themselves very substantial. Whatever secured claim the creditor had is eliminated, and it is reduced to the status of an unsecured creditor whose payment is likely to be eliminated or significantly diminished in distribution. *See, e.g., Brown, supra,* 106 B.R. at 862.

■ Second, the Debtor is entitled to statutory damages in light of the Defendant's violation of the TILA in failing to properly respond to the Debtor's rescission demand. *See e.g., Moore, supra,* 117 B.R. at 141; *Perkins, supra,* 106 B.R. at 874–75; *Brown, supra,* 106 B.R. at 862; and *Melvin, supra,* 75 B.R. at 958. The statutory damages are measured by double the amount of the finance charges imposed in the transaction up to $2,000. 15 U.S.C. § 1640(a)(2)(A)(iii). The finance charges in the instant transaction, as stated on the D/S, total $70,849.70. Therefore, the Debtor is clearly entitled to statutory damages in the amount of $2,000.

■ Third, the Debtor is entitled to a claim of recoupment against the Defendant in an amount equivalent to the statutory

damages of $2,000 on account of the TILA violations in the original contract. *See, e.g., Moore, supra,* 117 B.R. at 141–42; *Perkins, supra,* 106 B.R. at 875; *Celona, supra,* 90 B.R. at 115; *Melvin, supra,* 75 B.R. at 959; and *Tucker, supra,* 74 B.R. at 932.

Fourth, the Debtor is relieved of any liability to pay any finance charges to the Defendant in the transaction, per 12 C.F.R. § 226.23(d)(1). *See, e.g., Moore, supra,* 117 B.R. at 142; *Perkins, supra,* 106 B.R. at 874; *Brown, supra,* 106 B.R. at 862; *Celona, supra,* 90 B.R. at 115; *Melvin, supra,* 75 B.R. at 958; and *Tucker, supra,* 74 B.R. at 932.

This court has noted that, in appropriate circumstances, further remedies are provided for in § 1635(b) and § 226.23(d). Notably, the entire obligation of the debtor to the creditor can be deemed eliminated. *See, e.g., Gill v. Mid–Penn Consumer Discount Co.,* 671 F.Supp. 1021, 1026 (E.D.Pa.1987), *aff'd,* 853 F.2d 917 (3d Cir.1988); *Perkins, supra,* 106 B.R. at 875; and *Tucker, supra,* 74 B.R. at 933. While the Debtor has apparently waived this remedy by merely seeking a recoupment against the Defendant's claim, *see Perkins, supra,* 106 B.R. at 875; *Brown, supra,* 106 B.R. at 862; *Celona, supra,* 90 B.R. at 115; and *Tucker, supra,* 74 B.R. at 933, she has demanded the seemingly more drastic remedy of requesting that her payments made of $5699.18 be returned to her. *See Perkins, supra,* 106 B.R. at 875; *Gurst, supra,* 79 B.R. at 979; and *Tucker, supra,* 74 B.R. at 933.

In *In re Michel,* 140 B.R. 92, 101 (Bankr. E.D.Pa.1992), we stated the following about the potential remedies of wiping out a creditor's claims entirely and/or forcing the creditor to repay payments made on validly-rescinded loan transaction:

> We believe that the last sentences of § 1634(b) and 12 C.F.R. § 226.15(d)(4) [now § 226.23(d)(4) ] provide us with statutory authority to confine such harsh remedies to situations where creditors have tried to deceive or cheat the consumer. *See Shepeard v. Quality Siding & Window Factory, Inc.,* 730 F.Supp. 1295, 1307 (D.Del.1990); *Mayfield v. Vanguard Savings & Loan Ass'n,* 710 F.Supp. 143, 148 (E.D.Pa.1989); and *Gurst, supra,* 79 B.R. at 979.

*See also In re Apaydin,* 201 B.R. 716, 722–25 (Bankr.E.D.Pa.1996) (court requires a further hearing before it will provide even the remedy of striking the creditor's security interest).

We cannot say, as we did in *Michel,* that we detected no potential of "serious overreaching or improper conduct" by Gelt in the instant transaction. *Compare id.,* 140 B.R. at 101. However, we can say that the limited record provided insufficient evidence on which to reach such a conclusion, particularly as to this particular Defendant, which was not involved in the initial loan transaction and is only Gelt's assignee. We will therefore deny the Debtor's requested relief of directing that her payment of $5699.18 to the Defendant be refunded.

The Defendant's proof of claim is itemized as follows:

TOTAL PAYOFF AS OF FILING DATE
(7/17/98)

| | |
|---|---|
| Principal Outstanding | $32,250.00 |
| Interest @ $13.24/diem (1/18/97 to 7/17/98) | 7,231.67 |
| Late Charges | 150.00 |
| BPO Fees | 75.00 |
| Recording Fee | 32.00 |
| Attorneys Fees & Costs | 4,117.00 |
| TOTAL PAYOFF AS OF 7/17/98 | $43,855.67 |

It appears that, in light of our decision, the only viable claim of the Defendant is an unsecured claim in the amount of $32,250, less the Debtor's payments of $5699.18, or

$26,550.82. We are not inclined to allow the defendant its costs of pursuing enforcement of its invalid security interest. Nor will we set off the Debtor's $2000 statutory damages for the Defendant's violation of 15 U.S.C. § 1635(b) against the claim at this point.

The Debtor's Chapter 13 plan, presented with her initial bankruptcy filing on July 17, 1998, contemplates payments of $271.38 for 60 months. It further goes on to reference a distribution to BONY to cure the arrears on the underlying mortgage. It seems rather clear that the Debtor would alter this distribution schedule in light of the result of this Proceeding. However, the striking of the Defendant's security interest would, per the Debtor's Schedules, leave the Home, valued at $43,000, secured by only a real estate tax lien of $800. A distribution to unsecured creditors, including the Defendant's claim of $26,550.82, may therefore be necessitated by 11 U.S.C. § 1325(a)(4). The Debtor will be expected to address the necessary amendments to her plan and what she perceives to be the general direction of this case at the continued confirmation hearing of February 25, 1999. We note that a continued hearing on the Trustee's motion to dismiss this case, filed on December 18, 1998, due to the Debtor's alleged failure to make payments to the Trustee and the alleged infeasibility of her plan, is also scheduled on February 25, 1999.

### D. CONCLUSION

An order consistent with the conclusions reached in the within Opinion will be entered.

### ORDER

AND NOW, this 24th day of February, 1999, after a trial of this proceeding on January 14, 1999, and upon consideration of the parties' respective timely post-trial submissions, it is hereby ORDERED AND DECREED as follows:

1. Judgement is entered in favor of the Plaintiff–Debtor, FLORENCE RALLS ("the Debtor"), and against Defendant THE MONEY STORE FINANCIAL CO., INC. ("the Defendant") in substantial part, as described in the foregoing Opinion.

2. It is DECLARED that the Debtor properly exercised her right to rescind the parties' loan transaction of July 27, 1995, and that therefore this transaction is deemed properly rescinded by the Debtor.

3. The Defendant is forthwith directed to satisfy the mortgage which it has taken against the Debtor's residential real estate at 5840 Angora Terrace, Philadelphia, Pennsylvania 19143.

4. The claim of the Debtor is REDUCED and RECLASSIFIED as an unsecured claim in the amount of $26,550.82.

5. The Defendant shall pay the sum of $2,000 to Defendant EDWARD SPARKMAN, the Standing Chapter 13 Trustee ("the Trustee"), as damages pursuant to 15 U.S.C. § 1640(a)(2)(A)(i). The said Trustee shall determine whether this sum may be claimed as part of the Debtor's exemptions, and, if it may be, he shall forward this sum to the Debtor forthwith.

6. The parties are urged to attempt to agree upon reasonable attorneys' fees and costs which are due to the Debtors' counsel, pursuant to 15 U.S.C. § 1640(a)(3). If this matter is not resolved within fifteen (15) days, the Debtors' counsel may, within thirty (30) days of this order, file a Motion requesting a court award of such fees, said Motion to be procedurally in conformity with Local Bankruptcy Rule 2016.3. However, if the Debtor's counsel has made a reasonable request for such fees which is refused, said counsel may recover compensation for time spent on the fee application.

7. A second continued hearing on confirmation and the Trustee's motion to dismiss the Debtors' main case remains rescheduled on

THURSDAY, FEBRUARY 25, 1999, at 9:30 A.M. and shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107.

8. The Debtor is directed to indicate what steps she plans to take to obtain confirmation of a Chapter 13 plan at that hearing.