In re Kenneth D. APGAR, Debtor.

Kenneth D. Apgar Janet D. Apgar, Plaintiffs,

v.

Homeside Lending, Inc., et al., Defendants.

Bankruptcy No. 02–14144 SR. Adversary No. 02–0664.

United States Bankruptcy Court, E.D. Pennsylvania.

April 8, 2003.

Eric L. Frank, Esquire, Miller, Frank & Miller, Philadelphia, PA, for debtor.

Raymond E. Kenny, Sarah Pugh, Becket & Lee, LLP, Malvern, PA, Martin Mooney, Albany, NY, Kathleen Raup, Special Asst. U.S. Atty., Philadelphia, PA, for creditor.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### Introduction

Before the Court are cross motions for summary judgment as to the Plaintiffs' claims under the Truth in Lending Act (TILA)[1] and the Real Estate Settlement Procedures Act (RESPA).[2] Homeside alone seeks summary judgment on the Plaintiffs' claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UDAP).[3] A hearing on the motions was held on February 25, 2003 at which the Court heard oral argument and then took the matter under advisement. For the reasons set forth below, the Plaintiffs' motion will be granted as to their TILA claim, both motions will be denied as to the RESPA claim, and Homeside's motion as to the Plaintiffs' UDAP claim will be denied.

### Standard For Summary Judgment

The instant motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure ("Fed.R.Civ. P.").[4] Pursuant to Rule 56, summary judgment should be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). For purposes of Rule 56, a fact is material if it might affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party has the burden of demonstrating that no genuine issue of fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

The court's role in deciding a motion for summary judgment is not to weigh evidence, but rather to determine whether the evidence presented points to a disagreement that must be decided at trial, or whether the undisputed facts are so one sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247–252, 106 S.Ct. at 2509–12. In making this determination, the court must consider all of the evidence presented, drawing all reasonable inferences therefrom in the light most favorable to the nonmoving party, and against the movant. See United States v. Premises Known as 717 South Woodward Street, 2 F.3d 529, 533 (3rd Cir.1993); J.F. Feeser, Inc. v. Serv–A–Portion, Inc., 909 F.2d 1524, 1531 (3d Cir.1990), cert. denied, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991); Gould, Inc. v. A & M Battery and Tire Service, 950 F.Supp. 653, 656 (M.D.Pa.1997).

To successfully oppose entry of summary judgment, the nonmoving party may not simply rest on its pleadings, but must designate specific factual averments through the use of affidavits or other permissible evidentiary material that demonstrate a triable factual dispute. Celotex Corp. v. Catrett, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson v. Liberty Lobby, Inc., 477 U.S. at 247–50, 106 S.Ct. at 2509–11. Such evidence must be sufficient to support a jury's factual determination in favor of the nonmoving party. Id. Evidence that merely raises some metaphysical doubt regarding the validity of a material fact is

---

1. 15 U.S.C. § 1601 et seq.

2. 12 U.S.C. § 2601 et seq.

3. 73 P.S. § 201–1 et seq.

4. Fed.R.Civ.P. 56 is applicable to the instant proceeding pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure.

insufficient to satisfy the nonmoving party's burden. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). If the nonmoving party fails to adduce sufficient evidence in connection with an essential element of the case for which it bears the burden of proof at trial, the moving party is entitled to entry of summary judgment in its favor as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### Factual Background

In April 2000, IFG, a mortgage broker, telephoned Kenneth Apgar at his home to discuss refinancing possibilities. *See* K.Apgar Deposition, 33–34. At that time, Mr. and Mrs. Apgar had two mortgages on their home. *See Id.*, 20–21. While they were current on their mortgages, the Apgars were three years in arrears for local, state, and federal taxes. *Id.* at 23–27. A payment arrangement had been reached with the county and thus there was no threat of an imminent judicial sale of the Apgar's home. *Id.* at 28. Neither state nor federal tax enforcement actions were pending at this time. *Id.* at 29. As Mr. Apgar hoped to clear all of his tax arrears through refinancing, he was receptive to IFG's call. *Id.* at 27.

After this initial contact, Mr. Apgar provided IFG with financial information to process a loan application—pay stubs, W-2's, bank statements, tax statements, etc. *Id.* at 42. Mr. Apgar's application would then be submitted to Homeside for funding. *See* Plaintiff's Index, Ex. 9. Homeside was a mortgage lender to whom IFG referred prospective borrowers. *See*

Plaintiff's Index, Ex.7. Homeside would approve the loan to Mr. Apgar secured by a mortgage on the Apgar's home. *Id.*, Ex. 10, 11. This would require Mrs. Apgar, who was not the borrower, to co-sign the mortgage with her husband. *Id.*, Ex. 3,4.

The loan would close on July 25, 2000 making the first payment due September 1, 2000. *Id.*, Ex.4. Mr. Apgar would eventually fall behind in payments to Homeside; by the time of the bankruptcy filing (March 2002) he was at least three months in arrears. *See* K.Apgar Depo, 118–119. In May 2002, the Plaintiff's would commence this adversary proceeding.[5]

### Analysis of the TILA Claim

The Plaintiffs' TILA claim is that they were not notified of the right to rescind the contract. According to the Plaintiffs, what notice was given was directed only to the husband. Homeside makes two arguments in response. First, it was not required to notify Mrs. Apgar of a rescission right, because as a signer only of the mortgage, she had none. Alternatively, Homeside contends that the notice it gave effectively informed both spouses of that right.

### Lender's Obligation to Provide Mortgagor With TILA Disclosures

Homeside contends that because Ms. Apgar was merely the mortgagor in the subject transaction and did not apply for or receive credit, she was not entitled under TILA to disclosure of a right to rescind. Homeside is relying here on TILA § 1631(a) which states, in relevant part:

> in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action." B.R. 7020(a).

5. Although not a debtor, Mrs. Apgar is properly joined as a plaintiff pursuant to B.R. 7020. That rule incorporates Fed.R.Civ.Proc. 20 which provides: "[a]ll persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative

**Duty of creditor or lessor respecting one or more than one obligor**

Subject to subsection (b) of this section, a creditor or lessor shall disclose to the person who is obligated on a consumer lease or a consumer credit transaction the information required under this subchapter. *In a transaction involving more than one obligor, a creditor or lessor, except in a transaction under section 1635 of this title, need not disclose to more than one of such obligors if the obligor given disclosure is a primary obligor.*

15 U.S.C. § 1631(a) (emphasis added). But with any TILA question, statutory analysis is not enough; the interpretative regulation (here, Reg Z) must also be consulted. *See Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980) ("Congress has specifically designated the Federal Reserve Board and staff as the primary source for interpretation and application of truth in lending law").

Reg Z explains who must be given disclosures when a transaction involves multiple consumers. In transactions not involving the right to rescind, the section authorizes a creditor to make the required disclosures to "any consumer who is primarily liable on the obligation." 12 C.F.R. § 226.17(d). However, if the transaction involves the right to rescind under § 226.23, the disclosures must be made "to each consumer who has the right to rescind." 12 C.F.R. § 226.17(d). Is Mrs. Apgar such a consumer?

"Consumer" as defined in the regulation "means a . . . natural person to whom consumer credit is offered or extended. However, for purposes of rescission under § . . . 226.23, the term also includes a natural person in whose principal dwelling a security interest is or will be retained or acquired, if that person's ownership inter-

est in the dwelling is or will be subject to the security interest." 12 C.F.R. § 226.2(a)(11). Because Ms. Apgar granted Homeside a mortgage on her home, she is a "consumer" for purposes of rescission under § 226.23; *see In re Soto,* 221 B.R. 343, 359–61 (Bankr.E.D.Pa.1998).

Subsection (a) of § 226.23 identifies those consumers who have the right to rescind:

(a) Consumer's right to rescind. (1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction[.]

12 C.F.R. § 226.23(a). Since Mrs. Apgar granted Homeside a mortgage on her home, she is a consumer having the right to rescind. Homeside's first argument regarding the TILA claim is therefore rejected.

*Did the Notice Given Sufficiently Inform Ms Apgar of Her Rescission Right?*

Having determined that Mrs. Apgar, qua mortgagor, is entitled to notice of her right to rescind the loan to her husband, what then, exactly, constitutes the required disclosure of that right?

TILA provides that "information required by this subchapter shall be disclosed *clearly and conspicuously* in accordance with the regulations of the Board." 15 U.S.C. § 1632(a) (emphasis added). Again, the statute directs our attention to Reg Z for more detail:

(a) Form of disclosures.

(1) The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures shall be grouped together, shall

be segregated from everything else, and shall not contain any information not directly related to the disclosures required under § 226.18. The itemization of the amount financed under § 226.18(c)(1) must be separate from the other disclosures under that section.

12 C.F.R. § 226.17(a).

And when disclosure regards rescission, TILA provides:

(a) Disclosure of obligor's right to rescind

Except as otherwise provided in this section, in the case of any consumer credit transaction (including opening or increasing the credit limit for an open end credit plan) in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. *The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.*

15 U.S.C. § 1635(a) (emphasis added). Regulation Z interprets that disclosure to require the following:

(b)(1) Notice of right to rescind. In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered by electronic communication as provided in § 226.36(b)). The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(i) The retention or acquisition of a security interest in the consumer's principal dwelling.

(ii) The consumer's right to rescind the transaction.

(iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(iv) The effects of rescission, as described in paragraph (d) of this section.

(v) The date the rescission period expires.

(2) Proper form of notice. To satisfy the disclosure requirements of paragraph (b)(1) of this section, the creditor shall provide the appropriate model form in Appendix H of this part or a substantially similar notice

12 C.F.R. § 226.23(b)(1) and (2).

■ Thus, the TILA rescission provision places two affirmative duties on the creditor: first, that it "clearly and conspicuously disclose" the rescission right; and second, that it "provide appropriate forms . . . for the obligor" to exercise that right. 15 U.S.C. § 1635(a). The Plaintiffs maintain that Homeside did neither.

*Homeside's Claim that Mrs Apgar Received Notice of Her Right to Rescind*

Homeside maintains that the copy of the notice attached as Exhibit F to its Motion notifies both Mr. and Mrs. Apgar of their

right to rescind the loan. Indeed, Mrs. Apgar signed the Notice at the bottom acknowledging receipt of 2 copies. But Mrs. Apgar disagrees that this constitutes notice. She points out that the Notice is directed to her husband. Moreover, if she wanted to rescind, the notice in its present form would not allow it: there is only one signature line for rescission and underneath it is her husband's name, not hers. Given these apparent ambiguities, is the notice of right to rescind insufficient under TILA?

*Did Homeside Disclose to Mrs. Apgar her Rescission Right?*

■ Under both TILA itself and Reg Z, the test is whether the form of notice that Homeside provided constitutes a clear notice of Mrs. Apgar's right to rescind the loan. *See Porter v. Mid–Penn Consumer Discount Co.*, 961 F.2d 1066, 1076 (3d Cir. 1992) ("the law does not require an ideal notice of rescission rights, just a clear, accurate and conspicuous one"). Clarity is a function of whether the notice is subject to more than one plausible or sensible interpretation. *Id.* at 1077. If the notice is subject to two (2) or more sensible readings, and different results ensue depending upon which of the two (2) readings is adopted, the creditor has not provided the consumer with "clear notice of what [the] right to rescind entail[s]." *Id.* To determine whether the notice Mrs. Apgar did receive was confusing or misleading, we have no choice but to embark on a close reading of that notice which is attached as Ex. 5 to Plaintiffs' Index. It appears as follows:

NOTICE OF RIGHT TO CANCEL

Borrower(s): KENNETH D. APGAR

Mailing Address: 505 FALCON RD
NORRISTOWN, PA 19403

Security interest in property described as:
505 FALCON RD
NORRISTOWN, PA 19403

**YOUR RIGHT TO CANCEL**
You are entering into a transaction that will result in a mortgage/lien/security interest on/in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:
 (1) the date of the transaction which is

 JULY 25, 2000 ; or

 (2) the date you received your Truth–In–Lending disclosures; or
 (3) the date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on/in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at th location of the property. Money must be returned

to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL**
If you decide to cancel this transaction, you may do so by notifying us in writing at
HOMESIDE LENDING, INC.
SOUTHEAST REGIONAL OPERATION CENTER
7757 BAYBERRY ROAD–1ST FLOOR
JACKSONVILLE, FL 32256

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of <u>JULY 28, 2000</u> (Or midnight of the third business day following the later of the three events listed above.) If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

_____
KENNETH D APGAR Date

ON THIS DATE THE UNDERSIGNED EACH RECEIVED TWO (2) COMPLETED COPIES OF THE NOTICE OF OPPORTUNITY TO CANCEL.

[signature of Mr. Apgar and date appear in original]
KENNETH D. APGAR Date

[signature of Mrs. Apgar and date appear in original]

*See* Ex. 5 to Plaintiff's Index, p. 2.

Homeside essentially adopted Model Form H–8 as its form of disclosure. *Compare* Ex. 5 of Plaintiffs' Appendix *with* 12 C.F.R. § 226, App.H. To that form, Homeside made two alterations: first, it prints Mr. Apgar's name under the signature line for the obligor who opts to rescind; and second, it adds a written acknowledgment of both spouses (along with signature lines) at the bottom. Assuming Mrs. Apgar has a right to rescind the loan, does this form clearly and conspicuously inform her of that right? Mrs. Apgar maintains that these changes to the form render it "inaccurate, or at least unclear" so much so as to constitute a failure to disclose. *See* Plaintiffs' Brief, 18. Homeside disagrees stating that given the circumstances of the transaction, there is no plausible way to read that notice except to inform Mrs. Apgar that she had a right to rescind the loan. *See* Homeside Brief, 8–9.

*Is the Notice of Rescission Ambiguous as to Mrs. Apgar?*

A reasonable consumer could read the notice in at least four ways. First, although Mrs. Apgar received a copy, rescission requires the signature of *Mr.* Apgar alone. She could thus have understood the notice as giving her husband veto power over her rescission right, something which he certainly does not have. The notice could also be read to mean that Mrs. Apgar simply has no right to rescind. That is the alternative reading suggested by the Plaintiffs. A third reading might be that she has the right but through sloppy document

drafting she cannot exercise that right without necessarily altering the form. This would require her to strike out her husband's name under the signature line and write in her own. A fourth would be that both spouses signatures are required to rescind. However one reads the notice, each interpretation is sensible.

The consequences which flow from the consumer's ultimate reading would differ depending on how Mrs. Apgar read the notice. Obviously, if she believed that she may not rescind, she is bound to a contract which she now regrets. Or if she assumed her right to rescind was dependent on her husband's wishes, she might be able to obtain his consent. But if not, she would be in the same position as if she lacked the right in the first place. It is only the remaining interpretation that would allow her to rescind, but even that would require some initiative on her part; she would have to alter the notice and substitute her name and signature for her husband's.

Homeside counters with two arguments. First, it reads the pronoun "you" in the notice to mean both singular and plural. That term thus includes both spouses within the notice. But given the absence of any specific definition of that word and any direct address to Mrs. Apgar anywhere in the notice, that argument rings hollow. Second, Homeside asks the Court to "determine whether alternative readings of the notice are clear by considering the circumstances of the transaction." *See Williams v. Empire Funding Corp.,* 109 F.Supp.2d 352, 358 n. 8 (E.D.Pa.2000). In other words, the Court may consider not only the language of the TILA required notice, but it may also consider extraneous information. *Id.* Homeside emphasizes that the loan closing occurred at the Plaintiffs' home and that it was handled by an attorney with whom the Plaintiffs' were familiar socially. To Homeside, while the notice may have been technically defective, there were other safeguards in place to protect Mrs. Apgar's interests.

The problem with this argument is that it is not in accord with the fundamental purpose of TILA. TILA is primarily a disclosure statute that does not require the consumer to suffer actual prejudice in order to maintain a cause of action. *See Williams, supra* at 360. Thus, whether a consumer is entitled to rescind a transaction covered by § 1635 and Regulation Z depends upon whether she received a clear notice of her right to rescission, not whether she was actually prejudiced by any ambiguity in the lending agreement. *Id.* at 360. As the Third Circuit stated in *Porter,* "[o]ur decision [granting a consumer the right to rescind within three years because of a faulty notice of her right to rescission] thus cannot turn on whether or not ... [the consumer] has suffered an injustice." *Id.,* at 1078.

In light of the aforesaid, the Court concludes that the several plausible readings of the right to rescind notice render it unclear, and thus, extend the period for rescission available to Plaintiffs to three (3) years after the date of the transaction.

### Analysis of the RESPA Claim

Plaintiff's RESPA claim is that part of the broker's compensation constitutes an illegal referral fee. Homeside opposes this count asserting that the entire fee paid to the broker was earned.

### Was Homeside's Payment of $3187.59 To IFG an Unlawful Referral Fee?

For brokering this loan, IFG received total compensation of $7984.47. Of that amount, $4796.88 was paid at closing and represents loan origination, processing, and application fees. *See* HUD–1 Ex. 2 to Plaintiffs' Index. The Plaintiffs see nothing objectionable in that. The balance of

$3187.59 is listed on the HUD–1 settlement sheet as a broker fee P.O.C. (Paid outside closing). Homeside made this payment to IFG directly. Payments from lenders to brokers such as this are known as "yield spread premiums." It is this payment about which Plaintiffs complain.

*Explanation of Yield Spread Premiums*

Useful insight into this aspect of mortgage financing is found in a recent Eight Circuit case, *Glover v. Standard Federal Bank*, 283 F.3d 953 (8th Cir.2002). The Eighth Circuit's explication on this point is worth quoting at length:

[ ]In the arena of retail and wholesale mortgages, banks such as Standard Federal fund mortgage loans originated by mortgage brokers. Mortgage brokers provide origination services and bring a borrower and a lender together to complete a loan. The Department of Housing and Urban Development ("HUD") estimates that mortgage brokers initiate about half of all home mortgages each year in the United States. These brokers provide "various services in processing mortgage loans, such as filling out the application, ordering required reports and documents, counseling the borrower and participating in the loan closing." Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, 64 Fed.Reg. 10080, 10081 (March 1, 1999) (*hereinafter* "HUD Policy Statement I"). Brokers may also offer goods and facilities such as office space and equipment to carry out loan-making functions. *Id.*

Brokers are entitled to compensation for their work and borrowers may choose to pay these fees in a variety of ways. The fees may be paid out-of-pocket by the borrower, they may be financed by adding the amount of such fees to the principal balance of their loan, or they may be paid indirectly by the borrower by way of a YSP paid by the lender to the broker. The second approach may not be available to all borrowers, however, if their loan-to-value ratio has already reached the maximum permitted by the lender. The payment of a YSP from the lender to the broker permits home buyers to pay some or all of the up-front settlement costs over the life of the mortgage through a higher interest rate. HUD Policy Statement I, at 10081.

In determining the amount of YSP to pay, wholesale lenders such as Standard Federal establish a wholesale price for originating loans and communicate this pricing schedule to brokers through daily rate sheets. Rate sheets set forth the amount that the wholesale lender will pay brokers for various types of mortgage loans, taking into account a number of variables. These rate sheets discuss loans in terms of "above par," "at par," and "below par." "The term 'par rate' refers to the rate offered to the broker ... at which the lender will fund 100% of the loan with no premiums or discounts to the broker." HUD Policy Statement I, at 10081, n. 1. If "the mortgage carries a higher interest rate, the lender is able to sell it to an investor at a higher price. In turn, the lender pays the broker an amount reflective of this price difference." Real Estate Settlement Procedures Act Statement of Policy 2001–1: Clarification of Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed.Reg. 53052, 53054 (October 18, 2001) (hereinafter "HUD Policy Statement II").

Regardless of how the broker compensation is handled, all costs are ultimately paid by the borrower, whether through direct fees paid to the broker, through the loan principal or through the interest rate arranged with the lender. So, when a mortgage broker originates a

loan above par, the broker receives a YSP payment from the mortgage lender which is based upon the daily rate sheet and the interest rate of each loan offered by the broker to the borrower. HUD Policy Statement I, at 10081. In this way, as earlier indicated, the borrower indirectly finances the amount of that premium through the mortgage lender so as to avoid the necessity of a direct payment to her broker, thereby reducing the amount of out-of-pocket expenses required at, or prior to, closing. *Id.*

*Glover, supra* at 957–958

*How the Yield Spread Premium in this Case was Derived*

The YSP of $3187.59 was derived by multiplying the loan amount by the percentage over par that the loan would bring on the secondary mortgage market. The above par rate was published on a daily rate sheet that Homeside distributed to brokers on July 14, 2000. *See* Ex. 14, Plaintiffs' Index. For the Apgars, IFG could obtain a 30 year fixed rate loan from Homeside in the amount of $176,500 at 9.75% interest. The rate of interest quoted (locked-in) for 25 days would be 102.69. This figure was then adjusted upward and downward as follows:

### HomeSide Lending, Inc
### Pricing Breakdown for Apgar Loan

| | |
|---|---:|
| 25–day secondary market execution for 9.750% Convention 30 Year Fixed (F30) | 102.969 |
| + Spread adjustment between 25–day and 15–day price | 0.062 |
| | = 103.031 |
| − Price adjustment for Expanded Approval Level II D.U. Finding[sic] | −3.000 |
| | = 100.031 |
| + Servicing Release Premium | 1.775 |
| | = 101.806 |

*See* Plaintiffs' Index, Ex.15.

The first adjustment increases the rate by .062 due to the shorter lock-in period, 15 days. According to Ari Sadoff, IFG's President, this shorter time period results in an improved price in the secondary market. He explained this as a basic principle of finance: the shorter the commitment, the less the risk of adverse interest rate fluctuation. *See* Sadoff deposition, pp. 181–183.

Next, the rate was decreased a full three points. This adjustment was based on the Apgars' posing a high risk of default. *See* Benzley Deposition, pp. 63–64. It is provided for on the rate sheet. *See* Ex. 14 to Debtor's Index, box titled "Expanded Approval Program." It states on the sheet that if the loan is referred with what is termed "Level II Caution," the price the loan would bring in the secondary market is to be reduced by 3 points. *See Id.*

Finally, the rate would be increased by 1.775 to reflect a Servicing Release Premium (SRP). Bruce Benzley, Homeside's representative, described an SRP as a fee charged by the seller of a mortgage loan to the buyer. It represents the present value of the servicing rights of that loan. Benzley Depo., 92. In this case, Homeside was willing to pay IFG that value (less a discount for its profit margin) because, theoretically, IFG could have made the mortgage loan itself and, more importantly, could have retained the servicing rights. *Id.* at 94. Homeside paid IFG the SRP to induce it to release those rights. In fact, Mr. Benzley testified that mortgage loan

servicing was Homeside's primary business.[6] *Id.* at. 92.

After all adjustments were made, the amount over par, 1.806, was multiplied by the loan amount ($176,500) to arrive at the yield spread premium, $3187.59. The Debtors maintain this fee was unearned and is thus a violation of RESPA.

*Analysis of RESPA and Related Regulations*

RESPA was enacted to initiate significant reforms in the real estate settlement process "to insure that consumers throughout the nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices...." 12 U.S.C. § 2601(a). RESPA prohibits the payment of some referral fees, stating:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a). Subsection (c) of section 2607 then qualifies subsection (a) by stating:

> Nothing in this section shall be construed as prohibiting (1) the payment of a fee ... (C) by a lender to its duly appointed agent for services actually performed in the making of a loan, [or] (2) the payment to any person of ... compensation or other payment for goods or facilities actually furnished or for services actually performed ....

12 U.S.C. § 2607(c)(1) & (2).

HUD is the administrative agency charged with enforcing RESPA. It is authorized by statute to prescribe rules and regulations, and to make interpretations of RESPA. 12 U.S.C. § 2617(a). HUD has issued regulations pursuant to this authority. *See* "Regulation X," 24 C.F.R. § 3500.1 *et seq.* The regulations proscribe referral fees, 24 C.F.R. § 3500.14(b),[7] and defines a "referral" as "any oral or written action ... which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service or business incident to or part of a settlement service when such person will pay for such settlement service or business incident thereto or pay a charge attributable in whole or in part to such settlement service or business." *Id.* at § 3500.14(f)(1). The regulations also implement subsection (c) of RESPA by providing that "[a] payment

---

**6.** Homeside has since been acquired by Washington Mutual. *See* Benzley deposition, p. 10.

**7.** Section 3500.14(b) provides:

No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person. Any referral of a settlement service is not a compensable service, except as set forth in § 3500.14(g)(1). A business entity (whether or not in an affiliate relationship) may not pay any other business entity or the employees of any other business

entity for the referral of settlement service business.
24 C.F.R. § 3500.14(b). Subsection (e) further provides:
An agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a practice, pattern or course of conduct. When a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business.
*Id.* at § 3500.14(e).

to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed" is permissible. *Id.* at § 3500.14(g)(1)(iv).

*RESPA Litigation Related to YSP's and HUD Policy Statements*

In the context of RESPA, the payment of yield spread premiums has generated a considerable amount of litigation. The legal uncertainty about lender payments to mortgage brokers for services performed caused Congress to direct the Department of Housing and Urban Development (HUD) to address the issue. *See* Conference Report on the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999, H.R. Conf. Rep. No. 105–769 (1998), *reprinted in* 1998 U.S.C.C.A.N. 539, 568. At that time, only one circuit court had ruled on the legality of a YSP. *See Culpepper v. Inland Mortgage Corp. (Culpepper I),* 132 F.3d 692 (11th Cir.1998). The Eleventh Circuit decided in favor of a mortgage borrower who argued that a YSP was illegal because it was tied not to services rendered but, rather, to the size and interest rate of their loan. The court agreed that the only service for which the YSP was compensation was the "service" of referring an above par loan to the lender, which RESPA does not permit. *Id.* at 697.

Contrary to the Eleventh Circuit's holding in *Culpepper I,* HUD issued Statement of Policy I explaining that lender payments to mortgage brokers are not illegal per se; yield spread premium payments may be legal (or illegal) in individual cases or classes of transactions. *See* HUD Policy Statement I, *supra* at 10084. Accordingly, the Policy Statement prescribes the following test:

In determining whether a payment from a lender to a mortgage broker is permissible under Section 8 of RESPA, the first question is whether goods or facilities were actually furnished or services were actually performed for the compensation paid. The fact that goods or facilities have been actually furnished or that services have been actually performed by the mortgage broker does not by itself make the payment legal. The second question is whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed.

In applying this test, HUD believes that total compensation should be scrutinized to assure that it is reasonably related to goods, facilities, or services furnished or performed to determine whether it is legal under RESPA. Total compensation to a broker includes direct origination and other fees paid by the borrower, indirect fees, including those that are derived from the interest rate paid by the borrower, or a combination of some or all. The Department considers that higher interest rates alone cannot justify higher total fees to mortgage brokers. All fees will be scrutinized as part of total compensation to determine that total compensation is reasonably related to the goods or facilities actually furnished or services actually performed. HUD believes that total compensation should be carefully considered in relation to price structures and practices in similar transaction and in similar markets.

*Id.*

The Eleventh Circuit would revisit this issue after the lender in *Culpepper* appealed from certification of a class of borrowers who challenged the legality of YSPs. *See Culpepper v. Irwin Mortgage Corp. (Culpepper III),* 253 F.3d 1324 (11th Cir.

2001). The court rejected the argument that HUD Policy Statement I overruled *Culpepper I*, as well as the lender's contention that the legality of a YSP payment could be determined only on a case-by-case basis. It held that the test for referral liability is not whether the broker performed some services, but whether the YSP is payment for those services. *Id.* at 1331.

This would cause HUD to clarify its policy on the legality of YSPs. HUD's Policy Statement II was issued "to eliminate any ambiguity concerning the Department's position with respect to those lender payments to mortgage brokers characterized as yield spread premiums … as a result of questions raised by … *Culpepper v. Irwin Mortgage Corp.*" HUD Policy Statement II at 53052. Policy Statement II disagrees with the Eleventh Circuit's holding, and reiterates the position taken in Policy Statement I—that yield spread premiums are not per se legal or illegal and that this turns on meeting the requirements of its two-prong test. *Id.* at 53054.

That test has been recently summarized by the Ninth Circuit:

> The 2001 Statement indicates that under the first prong, "it is necessary to look at each transaction individually, including examining all of the goods or facilities provided or services performed by the broker in the transaction, whether the goods, facilities or services are paid for by the borrower, the lender, or partly by both." *Id.* at 53055. It further states that a yield spread premium may not be presumed to be a referral fee based solely on the fact that the lender makes such a payment to a broker. *Id.* The 2001 Statement notes that yield spread premiums are by definition derived from the interest rate and that this, by itself, does not indicate whether a particular YSP is a payment for facili-

ties actually furnished or services actually performed. *Id.* HUD also makes clear that the first part of its test does not contemplate identifying or allocating which facilities, goods or services are performed for the lender or for the borrower as all of them inure to the benefit of both. *Id.* In addition, the 2001 Statement advises that the list of services provided in the 1999 Statement, while not exhaustive, is still accurate, and that compensation for them may be paid either by the borrower or the lender or partly by both. However, "[c]ompensable services for the first part of the test do not include referrals or no, nominal, or duplicative work." *Id.*

The 2001 Statement essentially repeats the considerations that HUD set out in the 1999 Statement for resolving the second, or reasonableness, part of the test. In sum, the pivotal question is whether a mortgage broker's total compensation is reasonable. Total compensation includes fees paid by a borrower and any yield spread premium paid by a lender, not simply the yield spread premium alone. *Id.* Total compensation to the broker must be reasonably related to the total value of goods or facilities provided or services performed; "simply delivering a loan with a higher interest rate is not a compensable service." *Id.* And payments must be commensurate with the amount normally charged for similar services in similar transactions in similar markets. *Id.*

*Schuetz v. Banc One Mortgage Corp.,* 292 F.3d 1004, 1011 (9th Cir.2002) *cert. denied* —— U.S. ——, 123 S.Ct. 994, 154 L.Ed.2d 913 (2003)

*Are the HUD Policy Statements Controlling, or Merely Persuasive, Authority?*

At oral argument, the Plaintiffs stated that they reserved the right to argue that the HUD Policy Statements are not con-

trolling here because they lack the force of law. Transcript of Hearing 9. They note that while three circuit courts have held that they must defer to the agency's pronouncement on this issue,[8] the Third Circuit has not yet ruled on it. *Id.* To what degree of deference are the HUD Policy Statements entitled?

■ When reviewing an agency's construction of a statute it administers, a court must first ask whether Congress has directly spoken to the precise question at issue. *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The legality of a YSP payment (or any other specific type of payment) to a mortgage broker is not directly addressed by RESPA. Neither is how one deals with the tension created by the words of subsections (a) and (c) of Section 2607. Thus, the intent of Congress on this issue is not expressly set forth in the statute. Therefore, under *Chevron*, the Court must determine whether HUD's analysis as set forth in its regulation is based on a permissible construction of the statute. *Id.* at 843, 104 S.Ct. at 2782.

■ "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Id.* at 843–44, 104 S.Ct. at 2782. Agency regulations promulgated under express congressional authority are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. *Id.* at 844,

104 S.Ct. at 2782. Regarding RESPA, it appears Congress did intend to delegate authority to HUD by expressly authorizing HUD to "prescribe such rules and regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of [RESPA]." 12 U.S.C. § 2617(a). HUD promulgated rules under RESPA at 24 C.F.R. § 3500.1 et. seq. (Regulation X), subject to notice and comment. Because these rules were promulgated under the express authority of Congress and adjudicated with apparent congressional intent to carry the force of law, they are accorded *Chevron* deference. *United States v. Mead Corp.*, 533 U.S. 218, 229, 121 S.Ct. 2164, 2172, 150 L.Ed.2d 292 (2001).

■ But it is not these regulations but the policy statements which are directly at issue. "[I]nterpretations contained in policy statements ... which lack the force of law-do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 1665, 146 L.Ed.2d 621 (2000)(*citing EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 256–258, 111 S.Ct. 1227, 1235–1236, 113 L.Ed.2d 274 (1991) (measuring deference given an EEOC policy statement interpreting a statute on *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) standards and not *Chevron* standards)). The Third Circuit has followed *Christensen* stating that agency interpretive guidelines do not rise to the

---

**8.** Cases reading the Policy Statements to have the force of law: *Schuetz v. Banc One Mortgage Corp.*, 292 F.3d 1004, 1012 (9th Cir. 2002) *cert. denied* —— U.S. ——, 123 S.Ct. 994, 154 L.Ed.2d 913 (2003); *Glover v. Standard Federal Bank*, 283 F.3d 953, 962 (8th Cir.2002); and *Heimmermann v. First Union Mortgage Corp.*, 305 F.3d 1257, 1261 (11th Cir.2002). *But cf. Krzalic v. Republic Title Co.*, 314 F.3d 875, 881 (7th Cir.2002) (denying *Chevron* deference to HUD Policy Statement regarding RESPA prohibition of settlement fee splitting, § 2607(b)). This year, the Fifth Circuit specifically avoided the question. *See O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 740–41 (5th Cir.2003).

level of a regulation and do not have the effect of law. *Madison v. Resources for Human Development, Inc.*, 233 F.3d 175, 185 (3d Cir.2000). Rather, it held that "opinion letters and similar documents" are "entitled to respect" under *Skidmore*, but only to the extent they have the "power to persuade." *Id.* at 186. For this Court, the policy statements in question, at a minimum, constitute persuasive authority.[9]

*Were Services Actually Performed for the Yield Spread Premium?*

Homeside defends its payment of the YSP noting the comprehensive settlement services which IFG rendered the Apgars. Plaintiffs contend that the disconnect between how the YSP is calculated and the services performed on the borrower's behalf demonstrates that the YSP is no more than a referral fee. *See* Plaintiffs' Brief, 28

To make its case that IFG earned the entire fee, Homeside relies on the testimony of Ari Sadoff, IFG's president. Mr. Sadoff lists the eighteen actions which IFG undertook to procure the Apgar loan:

i. Found the client;

ii. Determined their need;

iii. Visited their home to review programs and possibilities with them;

iv. Helped them avoid a sheriff's sale on their home;

v. Combined two mortgages into one mortgage thereby reducing their monthly obligation by approximately $250.00 per month.

vi. Completed a loan application;

vii. Collected their documentation

viii. Initiated and ordered verifications of employment, deposits and mortgages.

ix. Ordered loan payoffs;

x. Ordered title insurance;

xi. Found out tax information for plaintiffs;

xii. Ordered an appraisal;

xiii. Provided loan disclosures for them;

xiv. Participated in the loan closing;

xv. Analyzed their debt and income to prequalify them for the loan;

xvi. Determined the maximum amount they would qualify for;

xvii. Helped clear up some of plaintiff's credit problems; and

xviii. Helped plaintiffs get their taxes current and established a loan that would escrow their taxes and insurance so that plaintiffs would not be in arrears again.

Sadoff Deposition, 145–146. All of these actions would come within the definition of "settlement services" found in RESPA § 2602(3) [10] as well the interpretation pro-

---

**9.** One circuit court which accorded *Chevron* deference to the policy statement explained its decision as follows:

> HUD's *regulations indicate that a "statement of policy"* published in the Federal Register constitutes "a rule, regulation or interpretation" for purposes of RESPA. 24 C.F.R. § 3500.4(a)(1)(ii). Both policy statements are published in the Federal Register. Nothing suggests that the more formal process of notice and comment was short-circuited for any reason other than Congress's directive to issue the 1999 State-

ment of Policy within 90 days. Indeed, both policy statements comport with Congressional intent to provide a safe harbor for good faith compliance with HUD rules, regulations, and interpretations. 12 U.S.C. § 2617(a), (b). *Schuetz v. Banc One Mortgage Corp.*, 292 F.3d 1004, 1012 (9th Cir. 2002) *cert. denied* —— U.S. ——, 123 S.Ct. 994, 154 L.Ed.2d 913 (2003)

**10.** The statute defines "settlement services" to "include[ ] any service provided in connection with a real estate settlement including, but not limited to, the following: title searches,

vided in Regulation X.[11] Homeside maintains that given these comprehensive services, the total compensation to IFG was fair and reasonable.

*Plaintiffs' Argument that the Payment of the YSP to IFG Fails HUD's Two Prong Test*

Plaintiffs' challenge to the legitimacy of the YSP is two-fold. First, they argue that unlike the fee paid at closing, the fees paid outside of closing were not compensation for specific, itemized tasks. So for the Plaintiffs, while the broker's and lender's representatives could explain each variable component of the YSP, that did not establish a nexus between that payment and what IFG may have done to earn it.

Without that, the YSP was not payment for "services actually performed." 12 U.S.C. § 2607(c).

The Plaintiffs' next argument invokes the second part of the HUD test. They maintain that even assuming some of the total fee was earned, IFG was grossly overcompensated considering the value of those services. Other than those services paid for at closing, IFG did no more than act as a conduit for delivery of financial information to Homeside. *See* Plaintiffs' Brief, p. 30. The compensation received at closing was more than sufficient considering that in above par loans, the typical broker compensation is 2.312% of the loan amount. *Id. citing* H.Jackson and J. Ber-

title examinations, the provision of title certificates, title insurance, services rendered by an attorney, the preparation of documents, property surveys, the rendering of credit reports or appraisals, pest and fungus inspections, services rendered by a real estate agent or broker, the origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of loans), and the handling of the processing, and closing or settlement." 12 U.S.C. § 2602(3)

11. The regulation defines "settlement service" as any service provided in connection with a prospective or actual settlement, including, but not limited to, any one or more of the following:
(1) Origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of such loans);
(2) Rendering of services by a mortgage broker (including counseling, taking of applications, obtaining verifications and appraisals, and other loan processing and origination services, and communicating with the borrower and lender);
(3) Provision of any services related to the origination, processing or funding of a federally related mortgage loan;
(4) Provision of title services, including title searches, title examinations, abstract preparation, insurability determinations, and the issu-

ance of title commitments and title insurance policies;
(5) Rendering of services by an attorney;
(6) Preparation of documents, including notarization, delivery, and recordation;
(7) Rendering of credit reports and appraisals;
(8) Rendering of inspections, including inspections required by applicable law or any inspections required by the sales contract or mortgage documents prior to transfer of title;
(9) Conducting of settlement by a settlement agent and any related services;
(10) Provision of services involving mortgage insurance;
(11) Provision of services involving hazard, flood, or other casualty insurance or homeowner's warranties;
(12) Provision of services involving mortgage life, disability, or similar insurance designed to pay a mortgage loan upon disability or death of a borrower, but only if such insurance is required by the lender as a condition of the loan;
(13) Provision of services involving real property taxes or any other assessments or charges on the real property;
(14) Rendering of services by a real estate agent or real estate broker; and
(15) Provision of any other services for which a settlement service provider requires a borrower or seller to pay. 24 C.F.R. § 3500.2

ry, *Kickbacks or Compensation: The Case of Yield Spread Premiums,* at http://www.law.harvard.edu/faculty/hjackson/pdfs/january_draft.pdf, p. 94. The Plaintiffs maintain that IFG's total fee was 67% more than that average.[12] To the Plaintiffs, nothing in this transaction required extra work that would command such a fee. But however the Court rules on this question, the Plaintiffs ask that it keep in mind HUD's admonition that total compensation be measured against a standard of reasonableness. *See* Plaintiffs' Brief, 31.

Homeside's response to both arguments is to point to Sadoff's testimony where he listed eighteen specific tasks that IFG performed with regard to this loan. Homeside Brief, 12. In Sadoff's opinion, the extra compensation was fair and reasonable given what IFG had to do for the Apgars. Most important was IFG's efforts to keep the Apgar's from losing their home to foreclosure. *Id.* at p. 13.

*Was IFG More Than Amply Compensated By the Loan Origination Fee?*

■ As the HUD Policy Statements require a case by case analysis, the Court is compelled to examine each action for which IFG maintains compensation was earned. In doing that, the Court has compared those eighteen tasks with the examples of loan origination services set forth in HUD Policy Statement I:

(a) Taking information from the borrower and filling out the application;

(b) Analyzing the prospective borrower's income and debt and pre-qualifying the prospective borrower to determine the maximum mortgage that the prospective borrower can afford;

(c) Educating the prospective borrower in the home buying and financing process, advising the borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments could vary under each product;

(d) Collecting financial information (tax returns, bank statements) and other related documents that are part of the application process;

(e) Initiating/ordering VOEs (verifications of employment) and VODs (verifications of deposit);

(f) Initiating/ordering requests for mortgage and other loan verifications;

(g) Initiating/ordering appraisals;

(h) Initiating/ordering inspections or engineering reports;

(i) Providing disclosures (truth in lending, good faith estimate, others) to the borrower;

(j) Assisting the borrower in understanding and clearing credit problems;

(k) Maintaining regular contact with the borrower, realtors, lender, between application and closing to appraise them of the status of the application and gather any additional information as needed;

(*l*) Ordering legal documents;

(m) Determining whether the property was located in a flood zone or ordering such service; and

(n) Participating in the loan closing.

64 Fed.Reg. 10080, 10085. What is striking is that but for IFG's assistance in paying tax arrears, the remaining tasks cited by Mr. Sadoff would come within HUD's list of loan origination services.[13]

---

**12.** Accepting the average rate as quoted by the Plaintiffs, the difference is significantly higher than 67%. Here, total broker compensation is equal to 4.523% of the loan amount ($7984.47/$176,500). That makes IFG's total fee 96% more than that average.

**13.** The 2001 HUD Policy Statement reaffirmed this list of loan origination services. *See*

Arguably, then, IFG was almost fully compensated by the loan origination fee alone. Moreover, the Plaintiffs cite Professor Jackson's finding that average broker compensation, including a yield spread premium, is 2.312% of the loan amount. *See* Plaintiffs' Brief, 30. They note that the fee paid IFG just for loan origination was 2.375%. IFG maintains that it did some extra work to avoid foreclosure and in consolidating the Plaintiffs' mortgages (*see* Homeside Brief, 45), but the truth of that is very much in question. According to Mr. Apgar, there was no threat of foreclosure inasmuch as he had reached a payment arrangement with the local taxing authority. K.Apgar Deposition, 28. And any claim that IFG helped to consolidate the Apgars' two mortgages is refuted by Mr. Apgar's testimony that the loan amount was insufficient to take out the second mortgage. *Id.* at p. 119. These contradictions demonstrate that there yet exists a triable issue of fact which is absolutely central to the question of whether the YSP was earned. Consequently, both parties' request for summary judgment on this count must be denied.

*Homeside's Claim That No UDAP Violation Exists*

 Homeside alone seeks summary judgment on Plaintiff's Unfair Trade Practices and Consumer Protection Law (UDAP) [14] count. Citing *Epstein v. Goldome Federal Savings Bank*, 49 D. & C.3d 551, 1987 WL 59604 (1987), it maintains that UDAP does not apply to mortgage transactions. That case, however, is contrary to the law of this circuit. The Third Circuit has stated unequivocally that mort-gage transactions constitute "trade or commerce" within the scope of UDAP. *See In re Smith*, 866 F.2d 576, 581–582 (3d Cir.1989) ("Certainly, the mortgage transaction has all the ear-markings of a sale of a service within the scope of the UDAP."). Given the Third Circuit's pronouncement, Homeside's motion as to the UDAP count will be denied.

An appropriate order follows.

## ORDER

AND NOW upon consideration of the cross motions for summary judgment as to the Plaintiff's TILA and RESPA claim and Homeside's Motion for Summary Judgment as to Plaintiff's UDAP claim, and after a hearing held February 25, 2003, it is hereby

ORDERED that judgment is entered in favor of Plaintiffs and against Homeside as to the Plaintiffs' TILA claim; and it is further

ORDERED that both motions are denied as to the Plaintiffs' RESPA claim; and it is further

ORDERED that Homeside's motion regarding Plaintiffs' UDAP claim is denied; and it is further

ORDERED that a ruling on damages assessed pursuant to the above findings of liability will be issued after the remaining causes of action are adjudicated; and it is further

ORDERED that a status hearing shall be and hereby is scheduled for May 8, 2003, 10:00 A.M., United States Bankruptcy Court, 900 Market Street, 2nd Floor,

---

66 Fed.Reg. 53052, 53055.

**14.** The careful reader will notice that the acronym chosen for this count (UDAP) does not match the statute's title, the *U*nfair *T*rade *P*ractices and *C*onsumer *P*rotection *L*aw. Like most American jurisdictions, Pennsylvania has enacted this statute to prohibit and punish "*u*nfair or *d*eceptive *a*cts and *p*ractices." 73 P.S. § 201–3. Throughout the nation, such laws are generically known as UDAP statutes.

Courtroom No. 4, Philadelphia, Pennsylvania, 19107, to consider further scheduling in this adversary proceeding.